# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WYNN MA, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITE HERE! LOCAL 26,<br><br>    Defendant. | Civil Action No. 1:23-cv-11223-ADB |

## **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff Wynn, MA LLC ("Encore" or the "Company") respectfully requests that the Court vacate the arbitration award of Arbitrator Marc Greenbaum (the "Arbitrator"). As described below, the award does not draw its essence from the collective bargaining agreement between Encore and Unite Here! Local 26 (the "Union"). Further, the award is contrary to the dominant and well-established public policy against sexual harassment in the workplace.

Specifically, Encore terminated the employment of Tim Underwood for making sexually explicit comments to a female hostess. Underwood told the hostess, "my name ain't dick, keep it out of your mouth." Despite that the hostess told him to stop, Underwood said the phrase two more times.

The Union grieved Underwood's termination. Relying on the grievant's testimony, the Union argued that the comments were not sexual in nature and not unwelcome. Award of Arbitrator Mark Greenbaum (the "Award") [ECF 1-1], at 12, 13. The Arbitrator rejected these arguments, explaining "it is difficult to construe the remark as not having a sexual connotation" and "[t]he grievant's claim that [the statement] was a way of telling someone to be quiet requires more imagination that the arbitrator can muster." Award at 13. The Arbitrator found the

statements to be sexual in nature and unwelcome. Award at 13-14 The Arbitrator thus found that "Encore [has] demonstrated that the grievant engaged in verbal conduct of a sexual nature and directed it to a person to whom it was unwelcome" and this constituted just cause. While the Arbitrator acknowledged that Encore has a strong interest in deterring conduct in violation of its harassment policy, the Arbitrator nonetheless reduced the grievant's termination to a written warning and ordered that he be reinstated.

The Arbitrator's award must be vacated for two separate and independent reasons. First, by ordering that Encore re-employ an employee who sexually harasses his co-workers, the Arbitrator's award contravenes well-established public policies against workplace sexual harassment. Second, the Award is contrary to the terms of the parties' collective bargaining agreement: the Union and Encore agree that sexual harassment has no place in the workplace and have agreed that the workplace should be kept free from sexual harassers like Underwood. Accordingly, the Arbitrator's award must be vacated.

## I. LEGAL STANDARD

Rule 12(c) motions and Rule 12(b)(6) motions are governed by the same legal standards. As this Court has stated:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. While a complaint attacked by a Rule12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

*United States ex rel. D'Agostino v. EV3, Inc.*, No. 10-11822, 2014 U.S. Dist. LEXIS 138266, at *28 (D. Mass. Sept. 30, 2014) (Stearns, J.) (internal citations and quotations omitted). In reviewing such a motion, the Court should view all facts in the pleadings in the light most favorable to the non-movant. *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006). "The Court

may also consider documents if 1) the parties do not dispute their authenticity, 2) they are 'central to the plaintiffs' claim' or 3) they are 'sufficiently referred to in the complaint.'" *Calixte v. David*, 320 F. Supp. 3d 294, 297 (D. Mass. 2018) (quoting *Curran v. Cousins*, 509 F.3d 36, 44 (1st Cir. 2007)).

## II.     FACTUAL BACKGROUND

### A. Encore and the Union's Agreement and the Policy Against Sexual Harassment

Encore and the Union were parties to a collective bargaining agreement (the "CBA"). [ECF No. 1-2] Pursuant to the CBA, Encore and the Union agreed that discrimination based on sex has no place in Encore's workplace:

> The Employer and the Union agree that there shall be no discrimination as to wages, hours or working conditions against any employee on account of…sex…or any protected status as provided by law.

*Id.* at Art. 27, pg. 21. Encore and the Union also agreed that sexual harassment is intolerable and warrants discharge. They agreed that:

> Harassment and workplace violence will not be tolerated. Individuals engaging in such conduct will be subject to discipline including immediate discharge. Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile work environment, workplace violence and sexual harassment.
>
> Sexual harassment is a form of sex discrimination. No employee shall be subjected to sexual harassment in the workplace. … In this spirit a statement of policy and commitment to this principle will prevail in all work areas. The parties also agree that the employer will take reasonable steps to eliminate sexual harassment from the property whether from supervisors, employees or customers, including annual training for all employees and supervisors, of an awareness program regarding the problem of sexual harassment…
>
> The Employer agrees to give priority consideration to any grievance involving sexual harassment.

*Id.* at Art. 28, pg. 21–22.

In addition to the express recognition that the Company and the Union share about the

importance of preventing and deterring sexual harassment in the workplace, the Company maintains a separate sexual harassment policy applicable to all employees, officers, and directors at Encore. [ECF No. 1-3]. Pursuant to that policy, the Company identifies harassment as "unwelcome conduct, as determined by the recipient of the harassing behavior…based upon a Protected Characteristic." *Id.* at 2. As with the CBA, the policy defines sexual harassment to include, *inter alia*, "verbal or physical conduct of a sexual nature [that] has the purpose or effect of unreasonably interfering with an individual's work performance, or creating an intimidating, hostile, or offensive working environment." *Id.* Specifically, the policy explains that "[s]exual harassment may take different forms, including [v]erbal sexual harassment [such as] innuendos, suggestive comments, jokes of a sexual nature…and verbal abuse or 'kidding' that is oriented toward a prohibited form of harassment, including that which is sexual in nature and unwelcome." *Id.* at 2. The policy reiterates that Encore is "committed to taking all reasonable steps to prevent [] harassment and discrimination" and warns that "[i]f the Company finds that discrimination or harassment has occurred[], it will take appropriate corrective action up to and including termination of employment of the offending employee…" *Id.* at 2, 6. As found by the Arbitrator, Underwood, as well as all other Encore employees, underwent annual training on Encore's anti-discrimination policies. Award at 4. Thus, all Encore employees, including Underwood, are well-aware of the degree of seriousness with which Encore takes incidents of sexual harassment.

### B. Underwood's Sexual Harassment

Underwood was employed by Encore as a server in a restaurant known as the On-Deck Burger Bar. Award at 3.[1] As an employee of Encore, Underwood underwent annual sexual harassment training that reinforced his knowledge of Encore's policy against harassment and

---

[1] The facts in this section and Section C *infra* are drawn from the Arbitrator's award.

4

98655878v.3

discrimination. *Id.* at 4. That training paid special attention to the fact that "jokes of a sexual nature" and "verbal abuse or 'kidding'" which include remarks or comments that are "sexual in nature and unwelcome" constitute sexual harassment. *Id.*

On October 2, 2022, Underwood was rolling silverware along with another employee when a hostess walked by and noticed that Underwood seemed to be in a bad mood. *Id.* at 5. The hostess briefly spoke with Underwood's colleague, then asked Underwood if he was upset. In response to her question, Underwood told the hostess, "my name ain't [d]ick, keep it out of your mouth." *Id.*[2]

The hostess responded by asking whether Underwood was serious. *Id.* at 5. In response, Underwood again told the hostess, "my name ain't [d]ick, keep it out of your mouth." *Id.* at 5. The hostess responded to Underwood by telling him he was being disrespectful, that they do not joke like that, and told him to "chill out." *Id.* at 5–6. According to the hostess, Underwood again told her "my name ain't [d]ick, keep it out of your mouth." *Id.* at 6. The hostess stormed off, at which point the grievant belatedly realized that comments had upset her. *Id.*

The hostess immediately reported the incident to the restaurant's general manager because she was "quite upset" and felt that the grievant's use of the phrase had "strong sexual overtones" and was "disrespectful." *Id.* at 6–7. The hostess provided a written statement about the incident to Employee Relations, and the Director of Employee Relations interviewed Underwood on October

---

[2] The Arbitrator found that it appeared Underwood and the hostess had a good working relationship prior to October 2, 2022, the date on which he sexually harassed her. *Id.* at 5. As evidence of that good relationship, the Arbitrator cites an instance in which Underwood sent a TikTok video that contained foul language and imagery, and another instance in which Underwood made a joke disparaging people of the Muslim faith to the hostess. *Id.* at 5–6. The Arbitrator suggests that Underwood's history of sharing inappropriate videos and making discriminatory comments based on religion to the hostess is relevant context for considering whether Underwood sexually harassed her. *Id.* at 7–8.

5, 2022. *Id.* at 7. The grievant admitted his wrongdoing and, upon realizing that his job was in jeopardy, sent an e-mail to the manager acknowledging that he "underestimated" how much offense would be taken to his comments, and expressing his desire to return to work. *Id.* at 7. The Director of Employee Relations also interviewed the restaurant's General Manager, who reported that this was not the first instance in which Underwood had made an inappropriate comment. She had heard him say that he did not like "these f****** bitches." *Id.* at 7.

At the conclusion of his investigation, the Director of Employee Relations concluded that the grievant had repeatedly told the hostess that his "name ain't [d]ick, so keep it out of your mouth," and that there was sufficient evidence to conclude that Underwood had violated Encore's sexual harassment and warranted termination. *Id.* at 7–8.

### C. The Arbitrator's Award

The Union grieved Underwood's termination pursuant to the parties' grievance and arbitration procedure.[3] *Id.* at 1. Following the grievance procedure, the parties were unable to resolve the grievance and the Union demanded arbitration. *Id.* The Arbitrator held a hearing on the Union's grievance on February 23, 2023. *Id.* The Arbitrator identified the relevant issue as "whether there was just cause for the grievant's discharge?" and "If not, what shall be the remedy?" *Id.* at 2.

Based on the facts as set forth above, the Arbitrator found that Underwood had made the sexually explicit comments, and that they implicated Encore's policy against sexual harassment. *Id.* at 13. The Union contended that Underwood's comments were not sexual and also that the comments were not unwelcome. *Id.*, at p. 11, 13. The Arbitrator flatly rejected these arguments:

The comment that the grievant indisputably made to the hostess two or three times

---

[3] The grievance procedure is a three-step procedures set forth in Article 20 of the CBA. *Id.* at Art. 20. If the parties are unable to resolve the grievance at the third step of the grievance procedure, either party may demand arbitration of the grievance. *Id.*

> was certainly "verbal conduct…of a sexual nature." If all the grievant had said to the hostess was "my name ain't Dick", the Union's claim that the grievant was simply using a nickname for Richard might have some plausibility. Once he followed it by saying "so keep it out of your mouth" it is difficult to construe the remark as not having a sexual connotation. It does not suggest that the listener engage in a sex act. Indeed, the suggestion is quite the opposite. Nonetheless, the reasonable person hearing that comment would understand it as having sexual overtones and that suffices to implicate Encore's sexual harassment policy.

*Id.* at 13. While Underwood tried to claim that he was telling the hostess to be quiet, the Arbitrator explained that this "requires more imagination than the arbitrator can muster." *Id*.

The Arbitrator also found that the comments were unwelcome and found that whatever supposedly humorous exchanges the hostess had shared with Underwood did not license him to disrespect her personal boundaries. *Id.* at 14. The Arbitrator thus found that by ignoring the grievant's expressed personal boundaries after she had told him to stop, Underwood had committed sexual harassment. *Id.*

While the Arbitrator concluded that Underwood had engaged in sexual harassment, he did not conclude that termination was the appropriate level of discipline. The Arbitrator wrote:

> On this record, Encore must be deemed to have demonstrated that the grievant engaged in verbal conduct of a sexual nature and directed it to a person to whom it was unwelcome. It thus demonstrated just cause for disciplinary action. The more difficult issue in this case is whether the grievant's demonstrated misconduct was just cause for his summary termination.

*Id.* at 15. The Arbitrator acknowledged that the history of sexual harassment is endemic in the service industry and that Encore has good reasons for not resorting to half-measures. Nonetheless, the Arbitrator found that affording Encore such discretion would somehow "undermine the Agreement's recognition of the role progressive discipline plays in the just cause analysis." *Id.* at 16. The Arbitrator also recognized that Encore nearly always terminated employees who violated the policy against sexual harassment, but found that Underwood's behavior was not as severe as those instances for which Encore had terminated employees. *Id.* at 8, 16–17. Accordingly, the

7

Arbitrator reduced the termination to a written warning and ordered Encore to reinstate Underwood. *Id.* at 18. The Arbitrator issued his Award to that effect on May 2, 2023. *Id.* at 19.

### III.  LEGAL ARGUMENT

Although the law is well settled that federal courts' review of arbitration awards is limited and deferential, there are nevertheless "exceptional situations in which courts do review the merits of labor arbitration awards." *Stroehmann Bakeries, Inc. v. Local 776 Intern. Broth of Teamsters*, 696 F.2d 1436 (3d Cir. 1992). One circumstance in which an award may be vacated is where the award "construes a collective bargaining agreement in a way that violates public policy" *Id.* Another is "when the arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice." *Axia Media Corp. v. Mass. Tech. Park Corp.*, 973 F.3d 133, 141 (1st Cir. 2020). In this case, the Award should be vacated for either of these separate and independent reasons.

First, the Award is contrary to the well-established policy against sexual harassment. The Arbitrator's findings establish that the employee engaged in sexually harassing conduct, but returned him to work. Such an Award flies in the face of the public policy against sexual harassment and warrants vacatur.

Second, the Award is also contrary to the terms of the parties' CBA and thus reflects the Arbitrator's own brand of industrial justice. Encore and the Union agreed not once, but twice, that sexual harassment is not to be tolerated in the workplace and that such conduct warrants immediate discharge. Encore, after an investigation, determined that Underwood sexually harassed an employee and therefore should be discharged. Despite this clear language and despite concluding that Underwood had engaged in the conduct for which he was terminated, the Arbitrator ordered Encore to reinstate him. The Award thus does not comport with the parties' CBA – which expressly

states that sexual harassment warrants discharge – and must be vacated because it reflects the Arbitrator's own brand of industrial justice.

### A. The Award Violates The Well-Established Public Policy Against Sexual Harassment

"As with any contract, [] a court may not enforce a collective bargaining agreement that is contrary to public policy." *W.R. Grace and Co. v. Local Union 759*, 461 U.S. 757, 765 (1983). To be sure, courts "may only vacate arbitration awards which explicitly conflict with well-defined, dominant public policy." *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 43 (1987). Nonetheless, vacatur is warranted "where the contract as interpreted [by the arbitrator] would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Boston Medical Center v. Service Employees Intern. Union, Local 285*, 260 F.3d 16, 23 (1st Cir. 2001). Accordingly, "if an arbitrator construes a collective bargaining agreement in a way that violates public policy, an award based on that construction may be vacated by a court." *Stroehmann*, 969 F.2d 1436, 1441 (3d Cir. 1992); *see also id.*

Application of the public policy exception is a two-step analysis:

> The threshold question is whether a well-defined and dominant public policy can be identified. If so, the court must determine whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated the public policy.

*Exxon Shipping Co. v. Exxon Seamen's Union*, 73 F.3d 1287, 1291–92 (3d Cir. 1996).

### 1. The Public Policy Against Sexual Harassment Is A Well-Defined and Dominant Public Policy

The first step of the analysis is easily met. Throughout the United States, and in Massachusetts in particular, there is a dominant and well-defined public policy against sexual harassment and in favor of preventing sexual harassment. Title VII of the Civil Rights Act of 1964 expressly prohibits harassment based upon sex. 42 U.S.C.A. § 2000e–2(a)(1). That prohibition has

been interpreted by the United States Supreme Court to include sexual harassment in the workplace. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64–67 (1986). Indeed, the central holding of *Meritor Savings Bank* is codified in federal regulations promulgated by the Equal Employment Opportunity Commission:

> Harassment on the basis of sex is a violation of [42 U.S.C.A. § 2000e–2(a)(1) ]. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

29 C.F.R. § 1604.11(a). The regulations also mandate that employers take reasonable steps to prevent sexual harassment in the workplace. They state:

> Prevention is the best tool for the elimination of sexual harassment. An employer should **take all steps necessary to prevent sexual harassment from occurring**, such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing methods to sensitize all concerned.

29 C.F.R. § 1604.11(f). The regulations further state that an employer is ultimately responsible for sexual harassment that occurs between fellow employees:

> With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

*Id.* at § 1604.11(d). Thus, the federal statutory and regulatory scheme codifies an express public policy against sexual harassment and in favor of its prevention and places the onus on employers to identify and take immediate and appropriate corrective action.

Beyond federal statutes and regulations, federal appellate courts have recognized that the policy against sexual harassment, as set forth in federal law, is a well-established and dominant

public policy. In *Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFL-CIO*, 915 F.2d 840 (2d Cir. 1990), the Second Circuit recognized, based upon its review of both federal law prohibiting sexual harassment and the Supreme Court's ruling in *Meritor*, that "[t]here is an explicit, well-defined, and dominant public policy against sexual harassment in the work place." Similarly, the Third Circuit has also held, after undertaking a similar review of the law, that there is both "a well-defined, dominant public policy against sexual harassment in the workplace," and "[i]n addition to the public policy against sexual harassment in the workplace, [there exists] a well-defined, dominant public policy favoring voluntary employer prevention and application of sanctions against sexual harassment in the workplace." *Stroehmann*, 969 F.2d at 1442 (3d Cir. 1992).

The Commonwealth of Massachusetts has also recognized an explicit and well-defined public policy against sexual harassment and in favor of preventing sexual harassment. Under Massachusetts General Laws ch. 151B, § 4, it is unlawful "[f]or an employer, personally or through its agents, to sexually harass any employee." Massachusetts law further mandates that "[a]ll employers, []and labor organizations shall promote a workplace free of sexual harassment" and that employers must "adopt a policy against sexual harassment" that includes, *inter alia*, "a description of the process for filing internal complaints about sexual harassment" in order to prevent such harassment from occurring. *Id.* at § 3A; *Springfield v. United Pub. Serv. Employees Union*, 89 Mass. App. Ct. 255, 261, 47 N.E.3d 447 (2016) (Title VII and Chapter 151B require employers to take prompt remedial action upon learning employee has been subjected to sexual harassment by non-supervisory coworker). And, beyond mere expressions of policy, Massachusetts law imposes serious consequences on an employer who fails to take remedial measures or takes remedial measures that are deemed inadequate, including punitive damages.

11

*Gyulakaian v. Lexus of Watertown, Inc.*, 475 Mass. 290 (2016) ("[w]here the employer's failure to remedy the discriminatory conduct is "outrageous or egregious," punitive damages may be imposed.").

Thus, there exists a clear, well-defined, and dominant public policy against sexual harassment and in favor of preventing sexual harassment in the workplace under both federal and Massachusetts state law.

### 2. The Award Violates The Public Policy Against Sexual Harassment

The second step of the analysis is also met because the Award condones sexual harassment in the workplace and inhibits Encore from taking reasonable steps to prevent sexual harassment in the workplace.

There is no ambiguity in the Award. In this case, the Arbitrator expressly found that Underwood sexually harassed his co-worker by saying to her multiple times, and after she asked him to stop, that his "name ain't [d]ick, so keep it out of your mouth." Award at 15. The Award plainly identifies the misconduct of which Underwood had engaged and concluded that it warranted discipline; specifically, it states that Underwood "engaged in verbal conduct of a sexual nature and directed it to a person to whom it was unwelcome. [Encore] thus demonstrated just cause for disciplinary action." *Id.* Despite his findings, the Arbitrator concluded, that although the "termination has been the most frequent sanction applied by [Encore] for instances of sexual harassment," and that the "language used by [Underwood] is more suggestive of a sexual act than acknowledged by the Union," it was, in his view, "less offensive than the language used in cases prompting an employee's termination." Award at 16. Thus, put simply, the Arbitrator found that although Underwood's behavior amounted to sexual harassment, he concluded that Underwood should be reinstated because his sexual harassment was not as bad as some other cases he had

12

reviewed warranting termination.

The Arbitrator's reasoning is directly at odds with public policy because it requires Encore to reinstate an employee who has committed sexual harassment. The Third Circuit's decision in *Stroehmann Bakeries* is instructive. 969 F.2d 1436 (3d Cir. 1992). In that case, an employee was accused by a customer's employee of having "sexually harassed her by touching one of her breasts without her consent, pushing himself against her and making explicit sexually charged remarks that were offensive to her while delivering bread to the store on November 12, 1989." *Id.* at 1438 There, the Arbitrator failed to make a finding regarding whether the grievant's misconduct amounted to sexual harassment and the Third Circuit concluded that an award which "reinstates an employee accused of sexual harassment without a determination that the harassment did not occur violates public policy." *Id.* at 1442. Therefore, the court reasoned, the arbitrator had "construed the Agreement between the parties in a manner that conflicts with the well-defined and dominant public policy concerning sexual harassment in the workplace and its prevention" because the award "would allow a person who may have committed sexual harassment to continue in the workplace without a determination of whether sexual harassment occurred." *Id.* On that basis, the Third Circuit affirmed the lower court's award remanding the matter to a new arbitrator for further proceedings. *Id.* at 1447.[4]

In this case, the Arbitrator has gone further than the arbitrator in *Stroehmann Bakeries*. In

---

[4] The Second Circuit decision in *Newsday* is also illuminating. There, the lower court explained that the arbitrator had concluded that although the defendant had made "unauthorized contact" with female co-workers, "these offenses are not ones that call for immediate discharge; instead, such offenses call for the application of progressive discipline." *Newsday, Inc. v. Long Island Typographical Union No. 915, CWA, AFL-CIO*, 1990 WL 302786, at *3 (E.D.N.Y. Feb. 6, 1990). The lower court found that the policy against sexual harassment would be "subverted when an employer is required to reinstate an employee who is a chronic sexual harasser." *Id.* at 4. Accordingly, the Court vacated the arbitrator's award, and the Second Circuit affirmed. *Id.* at 4; *Newsday, Inc.*, 915 F.2d 840 (2d Cir. 1990) (affirming vacatur).

98655878v.3

*Stroehmann Bakeries*, the Third Circuit found that by failing to make a determination about whether the grievant committed sexual harassment, it ran the risk of re-introducing an employee who committed sexual harassment back into the work environment. In other words, the Third Circuit was concerned that the employee may have committed sexual harassment, and his reinstatement would contravene public policy.

Here, the Arbitrator has made an express finding that Underwood sexually harassed his colleague in violation of both Encore policy and the CBA. Yet, notwithstanding that finding, the Arbitrator ordered Underwood reinstated – even though he acknowledged that termination was the most frequent sanction Encore applied to such conduct.  The Award does exactly what the *Stroehmann Bakeries* Court feared: it "would allow a person who []committed sexual harassment to continue in the workplace[.]" The Arbitrator's ruling is inconsistent with the public policy against sexual harassment and must be vacated.

Moreover, the Award is contrary to the public policy in favor of preventing sexual harassment in the workplace. In essence, the Award requires that Encore bear the risk of condoning an employee with a documented history of sexual harassment in the workplace and prevents Encore from taking reasonable steps to ensure sexual harassment does not occur on its premises. Indeed, Courts have recognized that employers have a heightened responsibility to prevent sexual harassment when an employee has already engaged in such prohibited conduct. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 341 (6th Cir. 2008) ("An employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser and is therefore on clear notice that the same employee has engaged in inappropriate behavior in the past."). In this case, Encore made the reasoned determination that permitting Underwood to remain in the work environment posed an unacceptable risk of further sexual harassment. As an employer, Encore

bears the responsibility under Title VII and Massachusetts law for remediating sexual harassment. Thus, the Award, by ordering Underwood's reinstatement, undermines not only the public policy against harassment in the workplace, but the carefully crafted statutory scheme which tasks employers with effectively remediating workplace harassment under pain of liability.

### B.     The Award Is Contrary to The Parties' CBA

In addition to being contrary to public policy, the Award must be vacated because it is contrary to the express language of the parties' collective bargaining agreement. The United States Supreme Court has held that courts may vacate an arbitration award that does not "draw its essence from the [collective bargaining] agreement." *Strathmore Paper Co. v. United Paperworkers Intern. Union AFL-CIO*, 900 F.2d 423 (1st Cir. 1990) (citing *United Steelworkers of Am. v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 597 (1960)).  In *Enterprise Wheel and Car Corp.,* the final *Steelworkers Trilogy* case, the Court expounded upon its standard for review of an arbitration award:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem ... **Nevertheless, an arbitrator is confined to interpretation and application of the collective bargain agreement; he does not sit to dispense his own brand of industrial justice.** He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement.  When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the awards.

363 U.S. at 597 (1960) (emphasis added); *see also Bacardi Corp. v. Congreso de Uniones Industriales de Puerto Rico*, 692 F.2d 210 (1st Cir. 1982).

A court may vacate an arbitration award that demonstrates a manifest disregard of the collective bargaining agreement and is unsupported by principles of contract construction and industry practice. *Hoteles Condado Beach v. Union De Tronquistas, Local 901*, 763 F.2d 34, 41 (1st Cir.1985) ("The arbitrator is, however, 'confined to the interpretation and application of the

collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions.'"). It is well-accepted that, although courts treat arbitration awards with deference, "a court will not merely rubber stamp its approval." *Teamsters Local No. 25 v. Penn Transp. Corp.*, 359 F. Supp. 344, 348 (D. Mass. 1973).

Here, the language of the CBA is express and unequivocal. It prohibits not only discrimination based upon sex generally, but also sexual harassment specifically. The CBA explains in no uncertain terms that "[h]arassment [] will not be tolerated" and that "[n]o employee shall be subjected to sexual harassment in the workplace." CBA at Art. 28. Indeed, the CBA contemplates that the appropriate remedy for sexual harassment is "immediate discharge." *Id.* The CBA further mandates that Encore will "take reasonable steps to eliminate sexual harassment from the property whether from supervisors, employees or customers[.]" *Id.*

Notwithstanding the plain language of the parties' CBA, the Arbitrator decided that Encore could not resort to immediate discharge in this case as a means for eliminating sexual harassment from its property. Award at 17–18. To be sure, the Arbitrator found that Underwood's behavior was sexual harassment. *Id.* at 15 ("On this record, Encore must be deemed to have demonstrated that the grievant engaged in verbal conduct of a sexual nature and directed it to a person to whom it was unwelcome. It thus demonstrated just cause for disciplinary action.") The Arbitrator nonetheless concluded that Underwood's misconduct was less severe than other instances in which employees were terminated for sexual harassment and ordered his reinstatement.

Ultimately, although nearly every employee had been terminated, the Arbitrator sought to compare Underwood's conduct to two incidents that did not result in termination: (1) an employee complaint that she was told by a co-worker that the complainant's shoes were inappropriate for

16

the kitchen and that the complainant flirts with everyone; (2) an employee made a romantic advance towards a co-worker even though she had a boyfriend, stared at her body and touched her hand. Award at 9. Although the evidence of the prior incidents, most of which resulted in termination, were based upon a chart rather than testimony from any first-hand witness, the Arbitrator went on to characterize the information in the chart. As to the incident involving the shoes, the employee acknowledged the conduct to Employee Relations and promised to not repeat it. He received a written warning. And while the employee accused the complainant of flirting, the employee's statement is hardly of a sexual nature. As to the incident in which the employee asked out a co-worker, the Arbitrator tried to claim that Underwood's conduct was less severe, despite that Underwood made vulgar, sexually charged statements, and despite that he refused to even acknowledge the sexual nature of his conduct. This is a quintessential example of an arbitrator attempting to substitute his own brand of industrial justice for clear contract language permitting immediate discharge. Contrary to the Arbitrator, Encore was not required to utilize progressive discipline. Having found that Underwood engaged in the conduct for which he accused, his termination should have stood.[5]

---

[5] The Award is even more troubling in light of the oversight to which Encore must submit in order to maintain its gaming license in Massachusetts. The Massachusetts Gaming Commission requires Encore to select and maintain an outside, independent monitor that is closely involved in monitoring Encore's Massachusetts operations to ensure that Encore is in compliance with its policies generally, and its Preventing Harassment and Discrimination policy in particular. In addition, the outside, independent monitor is present for all meetings of Encore's Board of Directors, reviews bi-weekly logs of all of Encore's sexual harassment cases, regularly sits in on Encore's weekly case reviews, and performs periodic focus group meetings with employees in each department to ensure that there is not unreported or uninvestigated harassment, including sexual harassment. The purpose of the outside, independent monitor is to, in part, ensure that Encore takes seriously the issue of sexual harassment on its property. Thus, Encore goes to significant lengths to ensure that such harassment does not occur and to prevent employees from being exposed to sexual harassment. The Award's mandate that the Company reinstate an employee who has already sexually harassed his colleagues is directly at odds with the Commission's mandate. *See Mass. Gaming Commission Seeking Independent Monitor for*

17

At bottom, Encore and the Union agreed that harassment and discrimination were intolerable elements of the work environment and that immediate discharge is the appropriate sanction. Underwood sexually harassed his coworker and was terminated in accordance with the CBA. An Award which reinstates him and mandates that the Company tolerate Underwood's sexual harassment not only undermines the parties' agreement that immediate discharge is warranted for discriminatory conduct, but also directly contravenes the parties' agreement that sexual harassment is intolerable. The Award must be vacated.

## IV.   CONCLUSION

Encore respectfully requests that the Court grant its motion for judgment on the pleadings, vacate the award and grant such other and further relief as the Court deems just and proper.

DATED: October 2, 2023

Respectfully submitted,

WYNN MA, LLC

By Its Attorneys,

*/s/ John T. Ayers-Mann*
Robert A. Fisher
rfisher@seyfarth.com
John T. Ayers-Mann
jayers-mann@seyfarth.com
SEYFARTH SHAW LLP
Seaport East
Two Seaport Lane, Suite 1200
Boston, Massachusetts  02210-2028
Telephone:  (617) 946-4800
Facsimile:   (617) 946-4801

---

*Encore Boston Harbor*, MASSLIVE, available at https://www.masslive.com/casinos/2019/05/mass-gaming-commission-seeking-independent-monitor-for-encore-boston-harbor.html.

98655878v.3

## **CERTIFICATE OF SERVICE**

I, John Ayers-Mann, hereby certify that on Monday, October 2, 2023, I caused a true and accurate copy of the foregoing document to be filed and uploaded to the CM/ECF system.

                                                    */s/ John T. Ayers-Mann*
                                                    John T. Ayers-Mann

98655878v.3