**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| WYNN MA, LLC,                                              ) | |
|                                                            ) | |
|                        Plaintiff                           ) | |
|                                                            ) | |
|            v.                                              )            C.A. No. 1:23-cv-11223 | |
|                                                            ) | |
| UNITE HERE!,                                               ) | |
| LOCAL 26                                                   ) | |
|                                                            ) | |
|                        Defendants                          ) | |
| _____) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT
ON THE PLEADINGS, INCLUDING ATTORNEY FEES, COSTS AND EXPENSES,
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE
PLEADINGS**

## I.      INTRODUCTION

Now comes Defendant UNITE HERE!, Local 26 ("the Defendant" or "the Union") which

respectfully moves this Honorable Court to grant judgment in favor of the Defendant pursuant to

Fed.R.Civ.P. 12(c) because Wynn MA, LLC, doing business as Encore Boston Harbor ("the

Plaintiff" or "the Company") cannot prove any claim upon which relief can be granted. The

Plaintiff's asserted grounds for vacating the award are so wholly without merit and frivolous that

this Court should also grant attorney fees, costs, and expenses to Defendant.

## II.    FACTUAL BACKGROUND[1]

### A.  Procedural History

Plaintiff and Defendant are parties to a collective bargaining agreement that provides a grievance/arbitration process. [*See* Exhibit A.] That agreement states, "any differences, disputes or grievances relating to the interpretation of this Agreement which arise during the terms of this agreement shall be disposed of as provided by this grievance and arbitration procedure." [Ex. A, p. 16.] If the grievance remains unresolved after exhaustion of the internal grievance process, the Union may submit the grievance to arbitration. [Ex. A, pp. 16-17.]

The Union filed a grievance relating to the termination of bargaining unit member and employee Timothy Underwood ("the Grievant"), which resulted in an arbitration proceeding before Arbitrator Marc D. Greenbaum. [*See* Ex. B.] On February 23, 2023, the parties appeared for hearing, stipulated to the issue to be decided, presented witnesses and submitted other evidence. The parties stipulated that the issues were "Whether there was just cause for the grievant's discharge? If not, what shall be the remedy?" [Ex. B, p. 2.]

Following the hearing, the parties submitted briefs, in which the Company again described the issue as whether there was just cause to terminate. [Ex. B, p. 1; Ex. C, p. 10.]

On May 2, 2023, Arbitrator Greenbaum issued his award, sustaining the grievance and ordering the Employer to reinstate the Grievant with retroactive seniority and backpay, to reduce the discipline to a written warning, and to make the Grievant whole. [Ex B, p. 19.]

---

[1] As this Court is bound by the arbitrator's findings of fact, even if clearly erroneous, the facts herein are derived from the arbitrator's award. *El Dorado Tech. Servs., Inc. v. Union Gen. De Trabajadores*, 961 F.2d 317, 320 (1st Cir. 1992) ("… as a general proposition, an arbitrator's factual findings are not open to judicial challenge.")

**B.  The Underlying Dispute**

The Grievant is a server on the second-floor restaurant at the Company's hotel, known as the On-Deck Burger Bar. [*Id.* at p. 3.] Prior to his discharge, the Grievant had no disciplinary record. [*Id.* at p. 3.]

On October 2, 2022, a colleague, who worked as a hostess, observed the Grievant in a bad mood. [*Id.* at p. 5.] The hostess claims that she asked the Grievant whether he was upset, to which he responded, "my name ain't Dick, keep it out of your mouth."[2] [*Id.*] When the hostess asked if he was serious, he repeated the phrase again. [*Id.*] The Company claims the Grievant "said the phrase two more times" (Plaintiff's Memorandum, pg. 1) but the Arbitrator did not so find. [Ex. B, p. 13 ("The comment … made to the hostess two or three times….").] Believing that they were joking, the Grievant only realized the hostess was upset when she stormed away. [*Id.* at p. 6.] Prior to this incident, the Grievant and the hostess had a friendly relationship, including exchanging off-color jokes and TikTok videos with similar offensive language.[3] [*Id.* pp. 4-5.]

---

[2] There were many different versions in testimony and witness statements of how the Grievant came to say this phrase, but there was no dispute that he said it. The discrepancies do not appear to be material to the Arbitrator in his Award.

[3] In its Memorandum, at footnote 2, Plaintiff challenges the Arbitrator's finding that the Grievant and hostess had a good working relationship despite the hostess' agreement on this point during her testimony. In any event, Plaintiff's contention mischaracterizes the record, asserting that "[the Grievant] made a joke disparaging people of the Muslim faith to the Hostess," but the Hostess made this joke to the Grievant. [Ex. B, p. 5.] While Plaintiff correctly asserts that the Arbitrator recounts the Grievant sending the Hostess a Tik Tok video, Plaintiff knows the hostess sent the video to the Grievant, not the other way around. [*See* Ex. C, p. 14.] Plaintiff erroneous asserted "[t]he Arbitrator suggests that [this history] is relevant context for considering whether [the Grievant] sexually harassed [the Hostess]," when the Arbitrator instead applied a "reasonable person hearing that comment" standard. [Ex. B, p. 13.] He did, however, note that the Company's own Director "acknowledged the importance … [of] the context in which the grievant claimed the statement was uttered and thus failed to assess the grievant's relationship with the hostess." [Ex. B, p. 7–8.] To be clear, the Union introduced much of this history to support its argument with respect to a key dispute of fact that the Arbitrator completely ignored—that the Grievant only learned this phrase when the hostess said it to him a few weeks earlier. In sum, while both parties disagree with some of the Arbitrator's findings of fact, the Court typically does disturb those findings. See *El Dorado Tech. Servs., Inc., supra.*

That night, the Grievant texted the hostess and apologized for upsetting her. He stated he did not intend to be disrespectful. [*Id*. at 6.] At the time of his apology texts, he was not aware that she had already complained to management. [*Id*.]

On October 5, the Director of Employee Relations (the "Director") interviewed the Grievant, who admitted to making the statement. [*Id*. at 7.] Later that day, the Grievant sent an email to his manager, apologizing for making the hostess uncomfortable and underestimating how offended she had been. [*Id*.] The Grievant promised he would be "more courteous and professional with all of [his] teammates." [*Id*.] He also expressed he wanted to apologize to the hostess but would understand that she might not be interested in hearing an apology. [*Id*.]

The Director concluded that there was just cause for the Grievant's termination, without investigating the relationship of the Grievant and the hostess. [*Id*. at pp. 7-8.]

The Union filed a grievance challenging the decision to terminate. In part, the Union asserted that the Grievant's termination was more severe than discipline issued to other bargaining unit members who engaged in similar or more egregious conduct. The parties stipulated at arbitration that the dispute was whether the Company violated Article 17 of the collective bargaining agreement, which provides "[e]mployees may be discharged. . . by the Employer for just cause" when it terminated the Grievant.  [Ex. A, p. 14.]

**C.  The Arbitrator's Decision**

The Arbitrator decided that the Company violated Article 17 by terminating the Grievant. [Ex. B, p. 19.]

The Arbitrator found that the Company had sufficient cause for disciplinary action, but not termination. [*Id*. at p. 15.] He looked to other cases at the Company involving discipline for violation of the sexual harassment policy. [*Id*. at p. 8.] Plaintiff asserts that it "nearly always

terminated employees who violated the sexual harassment policy (Plaintiff Memorandum of Law, p. 7), and "nearly every employee" who engaged in sexual harassment was terminated (*id.* at 16), nearly a fifth of all substantiated sexual harassment complaints resulted in discipline that was less than termination. There had been thirty-four employees disciplined for violating the Company's harassment policy, six of whom were not terminated. [Ex. B, p. 8.]

The Arbitrator principally relied upon Encore's own treatment of similar conduct and found that the Grievant's "verbal conduct was less serious than the totality of the conduct occurring three days prior to this incident that resulted in … a written warning." [*Id.* at p. 17.] "In that case, the employee made a romantic advance to a Coordinator even after learning she had a boyfriend, stared at her body and grabbed her hand." [*Id.*]  He found that the non-physical conduct was "a silent, but pernicious violation of her bodily integrity. Nothing like that was directed at the hostess. The Coordinator's bodily integrity was also invade in a more serious way by the physical touching." [*Id.*] That employee had admitted to the allegations, pledged that he would cease the conduct, and the Company issued only a written warning. [*Id.* at p. 9.]

The Arbitrator noted that the Grievant's "post-incident conduct puts him in at least as good as if not a better light than the server [who received a written warning]." [*Id.* at 17.] The Arbitrator highlighted the email the Grievant sent to his manager, recognizing his own culpability and promising to change his behavior. [*Id.*] "Because the grievant was treated more harshly than the contemporaneous offender, Encore has not sustained the burden of demonstrating just cause for his summary termination." [*Id.* at 18.]

### III.     ARGUMENT

#### a.   THE COMPANY MUST MEET AN EXTRAORDINARILY HIGH BURDEN TO JUSTIFY VACATING THE AWARD.

The parties receive their bargained-for result at arbitration. The parties agreed both generally (in the CBA) and with respect to this specific grievance (through the stipulated issue) that an arbitrator would decide whether the discharge violated the CBA's just cause requirement. The discipline of bargaining unit employees is a routine dispute in labor arbitration. This Arbitrator's decision should be affirmed based upon the extraordinarily deferential standard that courts afford arbitration.

In the landmark *Steelworkers* trilogy, the Supreme Court articulated its policy of deference to arbitration awards subject to judicial review:

> The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the award.

*United Steelworkers of America v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 596 (1960).

> The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator… In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

*United Steelworkers of America v. American Manufacturing Company*, 363 U.S. 564, 568 (1960).

> [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator.  It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*Enterprise Wheel and Car*, 363 U.S. at 599.

These principles of narrow judicial review of labor arbitration awards have remained immutable since the Court spoke in the *Trilogy* nearly sixty years ago.  See *Mercy Hosp., Inc. v. Mass. Nurses Assoc.*, 429 F.3d 338 (1st Cir. 2005); *Mercy Hosp., Inc. v. Mass. Nurses Assoc.*, 429 F.3d 838 (1st Cir. 2005); *Metro Hato Rey, Inc. v. Union Internacional De Trabajadores De La Industria De Automovile, Aeroespacial E Implemenentos Agricolas, UAW Local 2312*, 59 F.Supp.3d 326 (D. P.R. 2014); See also *United Paperworkers International Union, et al. v. Misco, Inc.*, 484 U.S. 29, 30 (1987) ("…it is the arbitrator's view of the facts and of the meaning of the contract that [the parties] have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts…  [A]s long as an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."); *W.R. Grace & Co. v. Rubber Workers Local 759*, 461 U.S. 757, 764 (1983); *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 411 (1976); *Chicago Newspaper Publishers' Ass'n v. Chicago WEB Printing Pressman's Union*, 821 F.2d 390, 394-95 (7th Cir.1987) ("'[i]t is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract ... that the award can be said not to 'draw its essence from the collective bargaining agreement.'") (quoting *Ethyl Corp. v. United Steelworkers*, 768 F.2d 180, 185 (7th Cir.1985))

The First Circuit has adhered emphatically and regularly to these narrow standards.  *Kraft Foods, Inc.  v. Office and Professional Employees International Union, Local 1295*, 203 F.3d 98, 100 (1st Cir. 2000):

> The general principles that we must apply are familiar.  Our review of
> labor arbitral decisions is extremely narrow and "extraordinarily

deferential." *Dorado Beach Hotel Corp. v. Union de Trabajadores de la Industria Gastronomica Local 610*, 959 F.2d 3-4 (1st Cir. 1992).

In *Larocque v. R.W.F. Inc.*, 8 F.3d 95, 96 (1st Cir. 1993), the Court emphasized the generous and

deferential standard of review, stating:

> A court should uphold an award that depends on an arbitrator's interpretation of a collective bargaining agreement if it can find, within the four corners of the agreement, <u>any plausible basis for that interpretation</u>.

(emphasis in original); quoting from *El Dorado Technical Servs., Inc. v. Union General de*

*Trabajadores de Puerto Rico*, 961 F.2d 317, 319 (1st Cir. 1992). Challenges to an arbitrator's

award are "a steep uphill climb" that "(t)ypically … will fail if the award 'draws its essence from

the collective bargaining agreement" rather than from the arbitrator's "own brand of industrial

justice." *Mercy Hospital, Inc. v. Massachusetts Nurses Assn.*, 429 F.3d 338, 343 (1st Cir. 2005),

quoting *Enterprise*, 363 U.S. at 397. <u>See also</u> *Cytyc Corp. v. Deka Prods. Ltd. Partnership*, 439

F. 3d 27 (1st Cir. 2006)*; Keebler Co, v. Truck Drivers, Local 170*, 247 F.3d 8, 10 (1st Cir. 2001);

*Service Employees Int'l Union v. Local 1199 N.E., SEIU*, 70 F.3d 647, 651 (1st Cir.1995); *Maine*

*Cent. R.R. Co. v. Brotherhood of Maintenance of Way Employees*, 873 F.2d 425, 428 (1st

Cir.1989) ("Judicial review of an arbitration award is among the narrowest known in the law.").

The Court in *El Dorado* also added:

> In labor arbitration, matters of contract interpretation are typically for the arbitrator, not for a review court.  While the arbitrator's award must draw its essence from the collective bargaining agreement, it need not mirror a judge's notion of how the agreement's language might best be interpreted or might most fairly be applied to a given set of facts.  So long as the arbitrator, acting within the scope of his delegated authority, is arguably construing the contract, his decision must stand.

961 F.2d at 319.  See also *Berklee College of Music v. Massachusetts Federation of Teachers*

*Local 4412*, 858 F.2d 31, 32-33 (1st Cir. 1988), cert. denied, 110 S.Ct. 53 (1989); *Crafts*

*Precision Industries Inc. v. Lodge No. 1836, I.A.M.* ("*Crafts Precision*"), 889 F.2d 1184, 1185

(1st Cir. 1989); *Local 1445, United Food and Commercial Workers International Union, AFL-CIO v. The Stop & Shop Companies*, 776 F.2d 19 (1st Cir. 1985); *Bettencourt v. Boston Edison Co.*, 560 F. 2d 1045 (1st Cir. 1977); *Local Union No. 251 v. Narragansett Improvement Co*, 503 F.2d 309 (1st Cir. 1974).  When the arbitration concerns the interpretation of a collective bargaining agreement, a court must refuse to set aside an arbitrator's decision "unless it can be shown that the arbitrator acted in a way for which neither party could [possibly] have bargained." *Local 1445, United Food & Commercial Workers Int'l Union,* 776 F.2d at 21 (citing *Enterprise Wheel*, 363 U.S. at 599).

Under *Bettencourt*, "exceptions to the rule of non-reviewability are… few and of a most limited nature." *Bettencourt*, 560 F.2d at 1049.  An arbitrator's decision may be reviewed on the merits only if the party seeking such review shows, at a minimum, "that the award is 'unfounded in reason and fact' [citation omitted], is based on reasoning 'so palpably faulty that no judge, or group of judges, could ever conceivably have made such a ruling' [citation omitted], or is mistakenly based on a crucial assumption which is 'concededly a non-fact '(quoting *Safeway Stores v. American Bakery and Confectionery Workers,* 390 F.2d 79, 82 (5th Cir.  1968)." *Id.* at 1050.

### b.  THE ARBITRATOR'S AWARD DRAWS ITS ESSENCE FROM THE AGREEMENT AND DOES NOT VIOLATE PUBLIC POLICY.

Here, the Arbitrator squarely addressed the parties' stipulated issue of whether there was just cause for the Grievant's discharge and, after review of the evidence, determined there was not. He concluded that discharge was too harsh a punishment, inconsistent with how the Company itself had punished more egregious conduct only three days earlier. The Company's claim that the Arbitrator "exceeded his powers" and "dispensed his own brand of industrial

justice" cannot be sustained when the parties asked him to evaluate the evidence and decide the issue of just cause. Those are the only factual and legal determinations he made.

i. **The Arbitrator Interpreted the Collective Bargaining Agreement**

Plaintiff's repeats its arguments to this Court that Article 28 requires the Grievant's termination after the Arbitrator considered, and rejected, those arguments. [*See,* Ex. C; Ex. B, pp. 15–16.] In sum, the Arbitrator held that a violation of the sexual harassment policy requires discipline pursuant to Article 28 (something the Union does not dispute) and that traditional just cause principles apply to whether the level of discipline was appropriate. [Ex. B, p. 13.] Respectfully, even if this Court disagrees with this interpretation of the relationship between Articles 17 and 28, the parties negotiated for, and received, the Arbitrator's interpretation.

The Plaintiff urges this Court to take the exceptional action of overturning the arbitrator's award because he applied traditional notions of just cause when it agreed just cause was the sole issue to be decided by the arbitrator. [*See* Ex. C, p. 10.] After the Arbitrator applied just cause principles, including equal treatment and the importance of progressive discipline (also codified in the parties CBA in Article 17), Plaintiff now demands that just cause does not apply. Instead, Plaintiff asserts that Article 28 prohibits an arbitrator from considering unequal treatment and the value of progressive discipline. The Arbitrator correctly understood, however, that the parties' submission of this case as a just cause question required application of at least some just cause principles within the context of Article 28.

Holding aside the Company's own invocation of just cause in the stated issue, the Arbitrator appropriately acknowledged that Article 17 and Article 28 are both part of a single agreement, which must be read as a whole document. He concluded:

> Article 28's reference to discipline might argue for conferring more discretion on
> Encore than normal. Doing so would undermine the Agreement's recognition of

the role progressive discipline plays in the just cause analysis. The Agreement's reference to just cause also preserves the Union's ability [to] demonstrate that a grievant was treated more harshly than would be suggested by an employer's previous discipline for the same offense.

[Ex. B, p. 16.]

Even if this Court were inclined to second-guess the Arbitrator's interpretation of the collective bargaining agreement, Article 28 does not require immediate discharge for every offense. The parties could have agreed that "Individuals engaging in such conduct will be subject to immediate discharge," but instead agreed that they will be "subject to discipline including immediate discharge." [Ex. A, p. 21.] Many, if not all, company policies advise that violations will result in discipline, and include the threat of discharge. These policies are always understood the mean that each case is judged by its own merits and that the most severe infractions receive the most severe punishment.

It is not surprising, therefore, that the Company's argument to this Court is at odds with the testimony of its own Director of Labor Relations. At hearing, the Director "acknowledg[ed the] importance [of] the context in which the grievant claimed the statement was uttered." [EX B, pp. 7—8.] This testimony, while not recounted in detail in the award, appears directly before the Arbitrator described the Company's prior discipline for violation of the Sexual Harassment policy, including six where the Company found termination was too harsh.[4] [Ex. B, pp. 8–9.]

In sum, it was the Arbitrator's task to interpret the CBA's inclusion of both just cause principles and joint commitment of anti-harassment, which he did through reference to the CBA

---

[4] Defendant takes particular exception to Plaintiff's argument that these comparisons were based upon "a chart rather than testimony from any first-hand witness." [Plaintiff's Memorandum, p. 17.] Without belaboring the point, the Company objected to the Union's request for information concerning comparable discipline, resulting in a conference call between the attorneys and the Arbitrator and, eventually, the production of this chart. It is frustrating to read the Company now argue that this information is an unreliable basis of comparison.

itself and the Company's own conduct. These findings are well within his authority and, respectfully, beyond the scope of what courts review.

    ii.  **The Award Does Not Violate Public Policy**

       While Courts have recognized there is a public policy against harassment, this policy does not require automatic termination for every employee who commits harassment. See *Westvaco Corp. v. United Paperworkers Intern. Union, AFL-CIO ex rel. Local Union 676*, 171 F.3d 971, 977 (4th Cir. 1999) (affirming arbitrator's award reinstating grievant found to have sexually harassed a coworker because he was not previously warned and pledged to correct his behavior); *Chrysler Motors Corp. v. Int'l Union, Allied Indus. Workers, etc.*, 959 F.2d 685, 689 (7th Cir. 1992) (affirming arbitrator's award reinstating grievant who sexually assaulted a coworker because of lack of prior discipline and belief that the grievant could be rehabilitated); *Commc'n Workers of Am. v. Se. Elec. Coop.*, 882 F.2d 467, 469-70 (10th Cir. 1989) (affirming an arbitrator's award reinstating a grievant accused of sexual assault based upon arbitrator's determination that "a one-time offense" accompanied by a "penitent and apologetic attitude" should result in a lesser penalty); *Way Bakery v. Truck Drivers Local No. 164*, 363 F.3d 590, 595 (6th Cir. 2004) (affirming arbitrator's award reinstating white grievant who made a racially insensitive remark to a black coworker); but see *Stroehmann Bakeries, Inc v. Local 776, Int'l Bhd. Of Teamsters*, 969 F.2d 1436, 1437-38 (3rd Cir. 1992) (vacating an award reinstating a grievant accused of sexual harassment because "reinstatement of this employee without a determination of the merits of the allegation [of sexual harassment] violates public policy."); *Newsday, Inc. v. Long Island Typographical Union, No. 915*, 915 F.2d 840, 845 (2nd Cir. 1990) (vacating an award reinstating a grievant accused of sexually harassing or assaulting three separate women four years after a prior arbitrator sustained a suspension for similar conduct,

which award further warned "[a]ny action … which is consistent with this past citable behavior shall be grounds for immediate discharge…."). The Fourth Circuit stated:

> There is no public policy that every harasser must be fired. . . nowhere in this litany of prevention and correction is there the suggestion that every employee who makes a mistake must automatically lose his or her job. And because misconduct often differs in degree, there is no universal punishment that fits every case. We therefore agree with those circuits that have concluded the general public policy against sexual harassment is not sufficient to supplant labor arbitration of employee disciplinary sanctions.

*Westvaco*, 171 F.3d at 977 (internal citations omitted).

In this case, reinstatement does not violate public policy because the Company remains able to prevent sexual harassment in the workplace. In the exceedingly rare cases (in total, two) where courts have vacated an arbitrator's award on public policy grounds due to sexual harassment, the Courts have determined that reinstatement would create a rule that would effectively prevent the employer from maintaining a workplace free of sexual harassment. See *Stroehmann*, *supra*.; *Newsday*, *supra*.

Neither *Stroehamm* nor *Newsday* are comparable to this case. First, the Arbitrator did make a finding of sexual harassment, such that *Stroehamm* would not apply. See *Stroehamm*, 969 F.2d at 1437-38. Second, the facts of *Newsday* were exceptionally egregious, involving a serial harasser, who had engaged in repeated, aggressive sexual harassment over many years, including a prior arbitration award holding that additional misconduct would result in termination. 915 F.2d at 845 (2nd Cir. 1990). These cases involve exceptionally rare facts that are not present here. Generally, courts defer to arbitrators' reasoned judgment that the severity of the misconduct and surrounding circumstances require reinstatement.

This deference is required to preserve the parties' bargain. In asserting that public policy prohibits reinstatement, the Company commits the same mistake as the employers in *Westvaco*,

*Commc'n Workers of Am*, *Chrysler*, and *Way Bakery* where the Fourth, Sixth, Seventh, and Tenth Circuits affirmed that they must defer to the arbitrator. *Westvaco*, 171 F.3d at 975; *Commc'n Workers of Am*, 882 F.2d at 468-69; *Chrysler*, 959 F.2d at 688-89; *Way Bakery*, 363 F.3d at 593. The *Commc'n Workers of Am.* Court reasoned that courts are not free to "reject factual findings with which we disagree or the arbitrator's interpretation of the contract." *Commc'n Workers of Am*, 882 F.2d at 468 (citation omitted). Courts have no authority to disagree with an arbitrator's judgment even if they believe his judgment is wrong if he has acted within the scope of his authority and applying the contract. *Id.* "This is especially true when it comes to formulating remedies." *Enterprise Wheel*, 363 U.S. at 597 (quoted in *Westvaco Corp.*, 171 F.3d at 977.)

Here, the Arbitrator weighed the Grievant's prior lack of discipline, his admission to the accusation, his credible assurance that he would change his behavior, and the Company's treatment of an employee who committed worse misconduct three days earlier. Courts have repeatedly deferred to similar rationales when affirming reinstatement of employees accused of harassment. See *Westvaco* 171 F.3d 971 (affirming reinstatement of an employee who had repeatedly sexually harassed a coworker because the company had not warned the employee and the employee had no prior discipline); *Chrysler* 959 F.2d 685 (affirming reinstatement of and employee who sexually assaulted a coworker because he had not been disciplined in the past and could be rehabilitated); *Commc'n Workers of Am* 882 F.2d 467 (affirming reinstatement of an employee who sexually assaulted a customer because it was a first-time offense and his apologetic nature led the arbitrator to believe that lesser discipline would suffice to correct his actions); *Weber Aircraft Inc. v. General Warehousemen and Helpers*, 253 F.3d 821 (5th Cir. 2001) (affirming reinstatement of an employee who had sexually harassed multiple coworkers).

As the Fourth Circuit "emphasized as a simple matter of judicial restraint our reluctance to invoke broad nostrums of public police to void private bargains," this Court should, respectfully, also protect the integrity of the parties' negotiated dispute resolution process.

As the Arbitrator correctly noticed, the Company's public policy argument is belied by its own conduct three days earlier. It is contradiction to claim that an Arbitrator is legally precluded from returning an employee to work who has engaged in sexual harassment when Plaintiff itself did so six times. It is hard to take seriously Plaintiff's argument that it violates a Massachusetts Gaming Commission mandate to "reinstate an employee who has already sexually harassed his colleagues." [Plaintiff's Memorandum, p. 17 (fn. 5).] Plaintiff half-heartedly conceals this contradiction, asserting it "nearly always terminated employees who violated the sexual harassment policy" (Plaintiff Memorandum of Law, p. 7), and "nearly every employee" who engaged in sexual harassment was terminated (*id.* at 16), when six of thirty-four, or almost fifth of all substantiated sexual harassment complaints resulted in less than termination. An honest account of Plaintiff's problem is not that everyone who engages in sexual harassment must be terminated, but that the Arbitrator refused to grant Plaintiff unfettered discretion to determine who should and should not be fired. As no such public policy exists, Plaintiff can only frame its argument around the public policy of sexual harassment and hope that the Court will not look as closely as the Arbitrator did at the Company's own practice.

In sum, even if this Court finds that a strong public policy exists with respect to preventing sexual harassment in the workplace, such a policy is not violated by reinstating this Grievant.

**c.  THE COURT SHOULD ORDER THE COMPANY TO COMPLY IMMEDIATELY WITH THE AWARD, TOGETHER WITH INTEREST FROM THE DATE OF THE AWARD, AND ATTORNEY'S FEES.**

The Company's spurious challenge to the award is so specious, it should result in this Court's further order of attorney's fees and expenses. There is voluminous caselaw that has repeatedly confirmed an arbitrator's ability to reinstate an employee accused of a single inappropriate comment. Even worse, the Company's claim that public policy categorically prohibits reinstatement of an employee who commits sexual harassment is belied by its choice to continue employing at least six people who also engaged in sexual harassment. As its own conduct makes its Complaint dishonest, Defendant should be awarded attorneys fees and expenses and the Grievant should be awarded interest caused by Plaintiff's unreasonable and wasteful delay in complying with the award.

Forcing resort to the courts when it is unreasonable and wasteful has frequently resulted in judicial admonitions that parties engaging in unwarranted appeals of arbitration decisions do so at their peril.  A party that is needlessly forced to confirm a labor arbitration award is entitled to attorney's fees. *Local 285, SEIU v. Nonotuck*, 64 F. 3d 735 (1st Cir. 1995); and *Crafts Precision,* 889 F.2d 1184, 1186 (1st Cir. 1989).

This Award was the result of a simple discipline-for-just-cause arbitration. The Arbitrator thoughtfully analyzed the evidence, analyzed and applied the contract's language in the context of the Company's own disciplinary history, and issued his decision deferring to the Company's own practice. The Union is entitled to the finality of that decision.

The Company cannot credibly claim that public policy prohibits reinstatement of the Grievant with a written warning when it voluntarily retains twenty percent of employees that it believes have engaged in sexual harassment. It cannot honestly believe that public policy

prohibits the Arbitrator from issuing the same level of discipline that Plaintiff issued three days earlier to an employee who engaged in comparable conduct. Even if it disputes that such conduct was comparable, that type of dispute is unquestionably the Arbitrator's to resolve. Indeed, the parties both submitted arguments on that precise point.

The Union therefore requests that the Court issue an order enforcing the award, together with interest and the Union's fees and expenses incurred in connection with this aspect of the litigation.

## IV.    CONCLUSION

The Court should issue a decision Confirming the arbitrator's award and dismissing the Plaintiff's Complaint. Because the Plaintiff's claim is wholly without merit, the Court should further award attorney fees and costs.

Respectfully submitted,

UNITE HERE, Local 26,

By its Attorney,

/s/ James Hykel
James Hykel, Esq. (Bar 666861)
Pyle Rome Ehrenberg, PC
2 Liberty Square, 10th Floor
Boston, MA 02109
(617) 367-7200
jhykel@pylerome.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on