## THE LABOR RELATIONS CONNECTION

In the Matter of Arbitration Between:

**UNITE HERE, LOCAL 26**

And                                                                    **OPINION AND AWARD**

**ENCORE BOSTON HARBOR**

#840-22
(Timothy Underwood – Termination)

### APPEARANCES

**For the Union:**
James Hykel, Esq.

**For the Employer:**
Patrick A. Landroche, Esq.
Robert A. Fisher, Esq. (on brief)

### INTRODUCTION

On October 11, 2022 UNITE HERE, Local 26 ("the Union") filed a grievance alleging that Encore Boston Harbor ("the Employer" or "Encore") violated the parties' collective bargaining agreement ("the Agreement") by discharging Timothy Underwood ("the grievant") without just cause. When the parties could not resolve the grievance, the Union demanded arbitration and the undersigned was selected as arbitrator.

A hearing on the grievance was held before the undersigned on a video conference platform on February 23, 2023.   At that hearing, both parties were present and represented by counsel.  The grievant attended the hearing and testified on the Union's behalf.  Following the presentation of the evidence, both parties sought leave to submit post-hearing briefs. Upon their receipt by the Labor Relations Connection the dispute was ripe for resolution.

**THE ISSUES**

Whether there was just cause for the grievant's discharge?

If not, what shall be the remedy?

**RELEVANT PROVISIONS OF THE AGREEMENT**

**Article 17**
**Discipline and Discharge**

Employees may be discharged, suspended, or disciplined by the Employer for just cause. The parties agree that the policy of progressive discipline shall be used in all cases where warranted but egregious matters may result in suspension pending investigation (SPI) or termination with no prior discipline. …

With the exception of violations of the preventing harassment and discrimination policy, no disciplinary action may be used against an employee at arbitration … that is more than 12 months old from the date on which the grievance was filed (exception: can be used for impeachment purposes) …

**Article 28**
**Sexual / Harassment and Workplace Violence**

Harassment and workplace violence will not be tolerated. Individuals engaging in such conduct will be subject to discipline including immediate discharge. Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile work environment, workplace violence and sexual harassment.

Sexual harassment is also considered a form of sex discrimination. No employee shall be subjected to sexual harassment in the workplace. This shall include sexual harassment because of a person's sexual preference or orientation.

In this spirit a statement of policy and commitment to this principle will prevail in all work areas. The patties also agree that the employers will take reasonable steps to eliminate sexual harassment from the property whether from supervisors, employees or customers, including annual training for all employees and supervisors, of an awareness program regarding the problem of sexual harassment. The employers will confer upon request with the union regarding the contents and scheduling of such programs.

The Employer agrees to give priority consideration to any grievance involving sexual harassment.

## FACTUAL BACKGROUND

The grievant commenced employment as a server in a second-floor restaurant at Encore's hotel known as the On-Deck Burger Bar ("the Bar") in 2019.  As of the date of his discharge, he had no disciplinary record.

If the grievant's testimony is credited, the work atmosphere at the Bar was frequently punctuated by off color jokes among the employees.  There was also uncorroborated testimony that the restaurant's general manager ("the manager") was an occasional participant.  After the manager testified, the grievant recounted an incident where he claimed to have sought her advice whether to accept an invitation to Fenway Park from a high value guest. The manager is claimed to have responded that it was all right, but "[j]ust don't sleep with her."  The manager was not confronted with this statement and denied that the workplace humor in the restaurant was infused with sexual. The grievant also testified about an incident involving a September 2022 meeting about a donation drive where something the grievant is alleged to have said supposedly prompted the manager to refer to him as an "ungrateful bastard."  The manager is claimed to have heard about this and to calling the grievant in and assuring him that she had not done so.[1]

If any of all of this true, it occurred against the backdrop of strict regulation of workplace harassment in the both the Agreement and Encore policies. The grievant is subject to Encore's progressive discipline policy which provides that an employee will ordinarily receive two written warnings prior to being suspended or discharged.

---

[1]There was discussion about an unpleasant interaction between the grievant and a now departed Chief which, along with this incident has prompted the Union subtly to suggest and the grievant to suspect that he was being targeted by Encore.  There is no evidence that the hostess had any bias against the grievant thus fatally undermining this theory which is otherwise unsupported in the record.

The Agreement pays special attention to sexual harassment cases.  Article 28 of the Agreement effectively defines "just cause" to include sexual harassment and specifically recognizes that employees committing acts of harassment are subject to discipline including discharge. It recognizes the right of employees to work without being subject to such harassment and requires Encore to take reasonable measures such as training employees to anticipate and deter sexual harassment.

Encore employees, including the grievant, undergo annual sexual harassment training. That includes reinforcing their knowledge of its Preventing Harassment and Discrimination Policy.  Reflecting the problems that have plagued the hospitality industry, this policy is detailed and strict. It defines harassment to include unwelcome conduct, "as determined by the recipient" that can be "verbal, physical or visual", based upon a person's membership in a protected class. That definition includes conduct that "unreasonably" interferes with an employee's job performance. The policy devotes particular attention to defining verbal harassment. That definition includes, "jokes of a sexual nature…lewd remarks" and "verbal abuse or 'kidding'" which include remarks or comments that are "sexual in nature and unwelcome."  Examples of such conduct include joke, stories or "profanity that is sexually offensive[or] has sexual content."  Such conduct is also prohibited by Encore's Code of Business Conduct and Ethics Policy.

The grievant was terminated on October 11, 2022 for violating these policies based on an interaction with one of his working colleagues on October 2, 2022. His colleague worked as a hostess and, until the events in question, appeared to have a good workplace relationship with the grievant.  They appear to have exchanged off color jokes, although the hostess denied on cross examination the jokes exchanged had any sexual

content.  The grievant is claimed to have texted the hostess a link to a Tik Tok video that was replete with offensive language and imagery, without any apparent objection from the hostess.  The grievant also recounted the hostess as telling a joke that was disparaging of those of the Muslim faith. Notably, these exchanges primarily concerned third parties and did not involve their working colleagues.

According to the grievant, in the month prior to October 2 he was having a discussion with the hostess about her out of state boyfriend.  Upon being asked why she ventured so far to find a boyfriend, she is claimed to have responded: "my name ain't Dick, so keep it out of your mouth." The grievant claims to have understood the phrase to be a way of telling someone to stay out of their affairs and that this belief shaped his conduct on October 2. The hostess was not asked about this claimed interaction.

On the critical day, the grievant was rolling silverware along with another employee when the hostess walked by and observed the grievant's seemingly being in a bad mood.  She mentioned that to the employee working with the grievant. According to the grievant the hostess' spoke to the employee in Spanish and the grievant heard her use what he called a pet name she had for him.  In her written statement, the hostess claims to have told the grievant to lighten up and to have made   a "frowny" face to him.

The hostess testified that upon observing the grievant's demeanor and asking him if he was upset, he responded: "my name ain't Dick, keep it out of your mouth." The grievant claims to have thought that he was telling the hostess to keep quiet. The hostess did not understand if that way.  She testified to responding: "Are you joking?"  Her written statement recites her asking whether he was "serious."  She testified that the grievant responded by saying it again. Upon hearing him utter the phrase a second time,

her written statement recites her having told him that was being disrespectful and to "chill out." In her hearing testimony she claims to have said: "are you serious, we don't joke around like that." The grievant is claimed to have uttered the phrase a third time.

The grievant's account, albeit not his understanding of the interchange, is, in some respects, more inculpatory than the hostess'.  He testified that after he first uttered the critical phrase, she told him "don't disrespect me" which he somehow construed as continuing their joking relationship.  This belief is claimed to have prompted him to utter the phrase a second time to which she responded again "don't disrespect me." At that point, he testified to having stopped using the phrase and denied using it a third time.  His acknowledgement of only uttering the phrase twice is consistent with the written statement submitted by the employee with whom he was working.  The grievant acknowledged that after he resumed rolling silverware, the hostess "stormed off," prompting the grievant to realize that she was angry.

Later that evening, the grievant texted the hostess that he was not intending to be disrespectful and was only "joking around."  He apologized for making her "feel a certain type of way" and wished her a good evening. When she did not respond within five hours, he texted her again, asking her first if he still hated him. He testified that he was watching a documentary on Jeffrey Dahmer at the time, prompting him to write:  Because I'm still on the journey you sent me on.  Well, who th (for "the hell") kills a dead guy?  Rude."  The grievant testified that he intended to use the term "eats" rather than kills.

Unbeknownst to the grievant, the hostess had spoken with the restaurant's general manager about her interaction with the grievant because she understood the grievant's use of the phrase to have strong sexual overtones and to have been disrespectful.  The hostess

was apparently quite upset and after some encouragement, wrote a statement recounting her interaction and forwarded that statement to Employee Relations, prompting the Director of Employee Relations to interview the grievant on October 5, 2022.

The grievant was interviewed and afforded the opportunity to have a steward present who viewed the interview as having a pre-determined outcome. The grievant understood that his comment to the hostess accounted for his being called in for the interview. At that interview, the grievant admitted making the statement.  The Director is claimed to have thanked the grievant for "making it easy."

Later that day, the grievant sent an email to the manager.  It contained his apology for making the hostess take offense and acknowledged "underestimating" how much of an offense was taken. After expressing the hope that he would be permitted to return to work, he promised that upon his return he would be "more courteous and professional with all of my teammates."  He also expressed a desire to apologize to the hostess, but acknowledged understanding that she might not be interested in hearing it from him.

Shortly after October 5, the Director reviewed the statement from the hostess and a statement recounting the interaction from the employee who was working alongside the grievant.  The Director had multiple conversations with the restaurant's General Manager which were not memorialized in writing.  He recalled the General Manager relating an when she heard the grievant indicate his dislike of "these f****** bitches.

Ultimately, the Director was satisfied that his interview with the grievant aligned with the written statements of the hostess and the other employee. Taken together, he concluded that they demonstrated the grievant's repeated utterance of the critical phrase. Despite acknowledging its importance, the Director does not appear to have afforded

much, if any consideration to the context in which the grievant claimed the statement was uttered and thus failed to assess the grievant's relationship with the hostess.  He viewed the evidence as sufficient to provide just cause for the grievant's termination.

The grievant is not the first employee to run afoul of Encore's sexual harassment policy or the first to be disciplined based solely on verbal comments. The record contains evidence of thirty-four cases in which Encore disciplined employees violating its harassment policy. The thirty-four instances encompass both unit and non-unit employees and the time period prior and subsequent to the effective date of the Agreement.

Of those thirty-four cases, all but six resulted in the charged employee being terminated. Two of the six cases in which termination was not the consequence occurred prior to the April 19, 2021 effective date of the Agreement.  In one, an employee received a written warning after complimenting another employee's appearance in a dress. In another, an employee spilled lamb's blood on his shirt, prompting another employee to describe it as being from another co-worker's period.

The most relevant cases are those impacting unit members occurring subsequent to the Agreement.  Of the five cases in that group, three, including the present case, involve purely verbal conduct. In one case a unit employee described a photograph posted on social media of another employee as "the picture where you have your boobs hanging out." The complaining employee was described as being uncomfortable with that comment. The investigation sustained the allegation, resulting in the employee's discharge.  The Union did not grieve the termination. The Union has grieved a second case in which an employee was terminated for making comments to another employee in Spanish that were found to be "a commonly used sexually based slang term."

The Union did not grieve the termination of an employee who engaged in unwanted physical touching of another employee and who was found to have consumed four alcoholic drinks while on duty.  Nor did it grieve a final warning given to an employee for hugging and kissing a colleague. The investigation was unable to confirm that the complaining party told the colleague to stop, thus seemingly precluding a finding that the touching was unwelcome.

If we expand the universe of cases to include non-unit employees or cases arising prior to the Agreement, there is one case following the Agreement's effective date where a non-unit employee was terminated for asking another employee "can I ride you like a pony." In another post-Agreement case involving non-unit employees, an employee was terminated after calling a supervisor a "faggot" on the casino floor. In a third case, involving written comments, but no physical contact, an employee gave another employee a birthday card stating: "I hope you don't get raped by dolphins."  When an employee other than the recipient saw the card displayed in an open area and reported it as a result of feeling discomfort. The employee who wrote the inscription was terminated. based upon the "inappropriateness" of the message and the public display of the card.

Encore acknowledges that there have been cases where employees charged with uttering unwelcome comments have received only written warnings.  In one case an employee submitted a complaint after being upset by a comment from another employee describing her shoes as being inappropriate for the kitchen and suggesting that the complaining employee "flirts with everyone." That employee received a written warning. In another post-Agreement case occurring three days prior to the incident prompting the grievant's termination, a server was charged by a Coordinator with making advances to a

Coordinator despite learning she had a boyfriend, staring at the Coordinator's body and grabbing her hand.  The charged employee effectively admitted the allegations and pledged to Employee Relations that he would not repeat the conduct. That employee received a written warning.

## POSITIONS OF THE PARTIES

**Employer Position:**

The Employer claims to have demonstrated just cause for the grievant's termination.  The grievant, it says, repeatedly made a statement to a colleague that was offensive and suggested her performance of a sexual act and was also shown to be unwelcome. His conduct, it avers, was clearly prohibited by Encore policies prohibiting verbal sexual harassment. The grievant, it argues, was subject to serious discipline for violating those policies.

The Employer also claims to have demonstrated that the grievant's demonstrated misconduct provided just cause for his termination.  Numerous arbitrators, it argues, have found just cause for an employee's termination in circumstances like the present. Moreover, it contends, the evidence demonstrates that it has consistently terminated employees for conduct like the grievant's.  When it has issued sanctions less serious than termination, it says, the remarks were not as vulgar as the grievant's or the allegations against the employee had not been fully substantiated.

The Union's claim that relief is warranted, the Employer continues, must be rejected.  Thus, it says, the Union's claim that the statement uttered by the grievant was intended as a joke and should be treated as such cannot be accepted as the recipient did not see it that way and repeatedly advised the grievant that she found it unwelcome.  His

claimed apology, it argues, was anything but and fairly viewed was a continuation of the earlier discussion she found to be offensive.  There is also no evidence, it observes, supporting the Union's claim that the grievant was targeted for termination.

The Employer also asks the arbitrator to reject the Union's seeming efforts to call the recipients character into question. Whatever banter she may or may not have had with the grievant prior to the events in question is irrelevant.  She certainly notified the grievant that his conduct was unwelcome and the grievant responded by repeating the offensive comments.  That, it says, provided just cause for his discharge and it thus asks the arbitrator to deny the grievance.

**Union Position:**

The Union contends that the Employer failed to demonstrate just cause for the grievant's termination.  The grievant, it avers, lacked notice that the hostess would find his comments offensive and that his conduct would result in his termination.  Because these two requisites of workplace due process are lacking, the Union contends, the Employer's claim of demonstrating just cause for his discharge cannot be accepted.

The grievant's relationship with his colleague, the Union argues, included their exchanging jokes and comments that were lewd and offensive to women. The grievant, it says, was thus unaware that she would find similar comments when they were about her as opposed to some third party.  The Employer's failure to investigate that history and consider at is context for his claimed misconduct, the Union says, precludes finding just cause for any discipline, much less his discharge.

The Employer it contends cannot demonstrate the grievant's violation of its policies because the evidence does not support finding that his comment was unwelcome

because of the nature of his relationship with the hostess.  It is thus critical, it argues, that he ceased using the phrase once he realized his colleague found his comments unwelcome. There is also evidence, it argues, that the Employer has effectively condoned employees routinely uttering similar or worse things during working hours. These factors, it avers, preclude finding that the Employer demonstrated just cause for any discipline.

The grievant's discharge, the Union continues, also ignores the Agreement's mandate for using progressive discipline.  The Employer, it argued, failed to assess the grievant's conduct in the context of his relationship with his colleague or the normal level of such conduct in the restaurant.  The grievant's comment, it says, was not even intended to refer to a sex act but was instead a request for his colleague to keep quiet.  It was also in line with those cases in which employees have not been terminated solely on the basis of verbal conduct deemed to violate the relevant policies.

Ultimately, the Union says, on this record, the Agreement requires, at a minimum, that the grievant be afforded the opportunity to correct his behavior. It thus asks that the grievance be sustained. As a remedy, it seeks rescission of discipline or, in the alternative, a reduction of the discipline to a written warning.  It seeks a make whole remedy for the grievant in either scenario.

**OPINION**

Article 19 of the Agreement provides that employees may be disciplined or discharged for just cause and recites the parties' agreement to utilize progressive discipline "in all cases where warranted." Article 28 addresses sexual harassment cases, among others, and provides simply that employees "engaging in such conduct will be subject to discipline including immediate termination." It makes no reference to just

cause, much less progressive discipline.  This could suggest that the parties intended a standard other than the pure just cause standard to apply in cases like the present. Alternatively, the term "discipline" could reference the just cause standard in Article 19. Because this case has been submitted under the just cause standard, the arbitrator will apply the traditional just cause standards.

Under those standards, Encore has the burden of demonstrating that the grievant engaged in conduct warranting discipline and that the demonstrated misconduct warranted his discharge.  Encore has only sustained the burden of demonstrating that the grievant engaged in conduct warranting discipline.

The comment that the grievant indisputably made to the hostess two or three times was certainly "verbal conduct…of a sexual nature." If all the grievant had said to the hostess was "my name ain't Dick", the Union's claim that the grievant was simply using a nickname for Richard might have some plausibility.  Once he followed it by saying "so keep it out of your mouth" it is difficult to construe the remark as not having a sexual connotation.  It does not suggest that the listener engage in a sex act. Indeed, the suggestion is quite the opposite.  Nonetheless, the reasonable person hearing that comment would understand it as having sexual overtones and that suffices to implicate Encore's sexual harassment policy.

The grievant's claim that it was a way of telling someone to be quiet requires more imagination than the arbitrator can muster.  Even if that was his understanding, he should have realized that most people would not hear it that way and would hear its seemingly obvious sexual overtones.  The risk of a statement like the grievant's being misconstrued should fall on him, not on the person to whom the statement is directed.

The evidence also demonstrates that the grievant's verbal conduct towards the hostess was unwelcome. We can grant the Union's premise that the workplace atmosphere was less than antiseptic.[2] We can also assume that the grievant's relationship with the hostess included some ribald exchanges typified by the Tik Tok video. That acceptance does not undermine Encore's claim that the grievant's conduct towards the hostess was unwelcome.

Whatever off color behavior may have occurred between the grievant and the hostess concerned third parties largely unknown to both of them. Although it may be a double standard, engaging in such behavior concerning others did not imply that the hostess welcomed similar conduct directed towards her.

The hostess' claimed participation in these supposedly humorous exchanges thus did not license the grievant to ignore her personal boundaries. A contrary holding would raise the specter of discredited defenses to sexual assaults. Once the hostess communicated that the grievant's comment was disrespectful and unwelcome, he was obligated to cease uttering the statement. The hostess communicated that intent and by ignoring her signal the grievant violated applicable Encore policies.

The hostess' written account of the interaction with the grievant contained more compelling evidence of her manifesting unwelcomeness than did he hearing testimony. The hostess testified that her first response to the grievant was asking whether he was serious and following its second utterance repeating that inquiry with the admonition that they did not joke like that. Her contemporaneous written statement was stronger, describing her claiming to feel disrespected when he uttered it the second time.

---

[2]The Union has suggested that there was managerial condonation of the employee interchange. Other than the one claimed instance of the manager's discussion with the grievant about his accepting an invitation to Fenway Park from a guest, there was virtually no evidence of such condonation.

The grievant's account of his interaction with the hostess provided more compelling evidence of his ignoring her manifested unwelcomeness. The grievant testified that her response to both his first and second utterance referenced the concept of disrespect.  Under the grievant's version, he repeated the statement after the hostess put him on notice that she viewed it as disrespectful, a clear and obvious manifestation of unwelcomeness.  He may well have thought that the hostess was not being serious.  He was wrong and the risk of that error is properly borne by the grievant, not the hostess.

The Union's suggestion that the hostess' testimony about the grievant's comment being unwelcome is not worthy of credence falters at a number of points.  The claim seem beside the point since the grievant's testimony concerning her manifesting unwelcomeness was more inculpatory that the hostess' testimony.  The Union's intimations and the grievant's suspicion that some unnamed people at Encore wished to see the grievant gone is not relevant. That unknown group was never claimed to include the hostess.  There is no basis in the record for deeming the hostess' testimony to be tainted by bias other than her feelings about this encounter with the grievant.

On this record, Encore must be deemed to have demonstrated that the grievant engaged in verbal conduct of a sexual nature and directed it to a person to whom it was unwelcome.  It thus demonstrated just cause for disciplinary action. The more difficult issue in this case is whether the grievant's demonstrated misconduct was just cause for his summary termination.

Given the history of the industry in which it participates, Encore's interest in deterring employees from engaging in conduct violating its harassment policy is significant. Article 28 of the Agreement evidences the parties' recognition that class-

based harassment presents issues of special concern. Its provision for employee training and affording priority consideration to harassment grievances reflects interests of particular, but not exclusive, concern to the Union. Its provisions governing the availability of disciplinary sanctions are important to the Employer.

Article 28's reference to discipline might argue for conferring more discretion on Encore than normal. Doing so would undermine the Agreement's recognition of the role progressive discipline plays in the just cause analysis. The Agreement's reference to just cause also preserves the Union's ability demonstrate that a grievant was treated more harshly than would be suggested by an employer's previous discipline for the same offense. The Union has made such a demonstration thus compelling a finding that the Employer failed to demonstrate just cause for the grievant's summary termination.

The evidence demonstrates that termination has been the most frequent sanction applied by Encore for instances of sexual harassment. Employees should thus be aware that they engage in acts of harassment at their peril. The evidence also demonstrates that there have been cases, before and after the effective date of the Agreement, where Encore's disciplinary hand has been more restrained. The arbitrator must determine where the grievant's case falls on the spectrum of all of these cases.

The language used by the grievant is more suggestive of a sexual act than acknowledged by the Union and less suggestive than claimed by Encore. It is, however, less offensive than the language used in cases prompting an employee's termination. From the arbitrator's perspective, his statement was not as severe as calling someone a faggot, referencing a woman's boobs or expressing the hope that a woman would avoid

being raped by a dolphin. It thus does not rise to the same level of severity as the remarks deemed to warrant an employee's termination.

The grievant's verbal conduct was less serious than the totality of conduct occurring three days prior to this incident that resulted in the employee's receiving only a written warning.  In that case, the employee made a romantic advance to a Coordinator even after learning she had a boyfriend, stared at her body and grabbed her hand. The first two cited behaviors are classic instances of sexual harassment designed to make a woman as if not more uncomfortable than claimed by the hostess. Staring at the Coordinator's body was a silent, but pernicious violation of her bodily integrity. Nothing like that was directed at the hostess. The Coordinator's bodily integrity was also invaded in a more serious way by the physical touching. Without minimizing the hostess' discomfort, the tacit and actual violation of the Coordinator's bodily integrity was a more serious form of harassment than was the grievant's statement to the hostess.

Despite his conduct seemingly being more serious than the grievant's, the server's promise to behave to Employee Relations appears to have sufficed to head off his termination.  The grievant's post-incident conduct puts him in at least as good as if not a better light than the server. The grievant's October 5 email to his manager recognized he was in the wrong and needed to change. This message was likely prompted by his interview with the Director. It seems more powerful than the server's promise to Employee Relations, which was presumably made under the threat of more serious discipline. Despite these differences, the server received a written warning, while the grievant was discharged.  The evidence supports finding the grievant was treated more harshly than the server.

Because the grievant was treated more harshly than the contemporaneous offender, Encore has not sustained the burden of demonstrating just cause for his summary termination.  His verbal conduct was somewhat more severe than the post agreement case in which an employee received a written warning after commenting upon another employee's shoes.  On the other hand, his verbal conduct was less serious than the verbal conduct in the cases where termination was deemed warranted.  This also undermines Encore's weakened claim of having just cause for the grievant's discharge.

The circumstances of the grievant's expression of contrition to his manager provides more evidence than does the servers that his demonstrated misconduct is amenable to progressive discipline.  Since the grievant has no disciplinary record, Encore's policy would provide for his receiving a written warning, the first level of progressive discipline.

Because Encore has not demonstrated just cause for the grievant's discharge, the grievance must be sustained. The remedy shall include a reduction of the discharge to a written warning, reinstatement and make whole relief.

An appropriate Award shall enter.

**AWARD**

There was not just cause for the grievant's termination.  The grievance is, therefore, sustained.

As a remedy, the grievant's discharge shall be reduced to a written warning and his personnel record shall be amended to reflect that reduction.  He shall be reinstated with retroactive seniority, back pay (minus interim earnings and any unemployment compensation received) and all other make whole relief.

_____
Marc D. Greenbaum, Arbitrator
Dated:  May 2, 2023