UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WYNN MA, LLC, | * | |
| | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 23-cv-11223-ADB |
| | * | |
| UNITE HERE!, LOCAL 26, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

  This dispute arises out of an arbitrator's (the "Arbitrator") decision to overturn the termination of a former Wynn MA, LLC ("Wynn" or "Plaintiff") employee alleged to have engaged in sexual harassment in favor of a lesser discipline. [ECF No. 1 ("Compl." or "Complaint") at 1]. Presently before the Court are Wynn's motion for judgment on the pleadings seeking to vacate the Arbitrator's award, [ECF No. 14], and Unite Here!, Local 26's ("Local 26") cross-motion for judgment on the pleadings seeking to uphold the award, as well as for interest, attorneys' fees and costs, [ECF No. 17]. For the reasons set forth below, Wynn's motion, [ECF No. 14], is <u>DENIED</u>. Local 26's cross-motion, [ECF No. 17], is <u>GRANTED</u> insofar as the arbitration award is affirmed, the Complaint is dismissed, and Local 26 is awarded costs, and <u>DENIED</u> as to the request for interest and attorneys' fees.

## I.      LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Courts considering motions for judgment on the pleadings use a standard similar to the one used for motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), except that a "Rule 12(c) motion, unlike a Rule 12(b)(6) motion, implicates the pleadings as a whole."  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54–55 (1st Cir. 2006).  "Judgment on the pleadings is proper 'only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment.'"  Zipperer v. Raytheon Co., 493 F.3d 50, 53 (1st Cir. 2007) (quoting Aponte-Torres, 445 F.3d at 54).

"In reviewing a motion under Rule 12(c) . . . [the Court] may consider 'documents the authenticity of which are not disputed by the parties; . . . documents central to plaintiffs' claim; [and] documents sufficiently referred to in the complaint.'"  Curran v. Cousins, 509 F.3d 36, 44 (1st Cir. 2007) (third alteration in original) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

With respect to arbitral awards, they "are nearly impervious to judicial oversight."  Teamsters Loc. Union No. 42 v. Supervalu, Inc., 212 F.3d 59, 61 (1st Cir. 2000).  The court's

> authority . . . is very tightly circumscribed: "The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. . . . As long as the arbitrator's award 'draws its essence from the collective bargaining agreement,' and is not merely 'his own brand of industrial justice,' the award is legitimate."

Id. at 65 (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36 (1987) (quoting United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960))).  Put another way, "a court ought not . . . vacate an arbitral award 'as long as the arbitrator is even

2

arguably construing or applying the contract and acting within the scope of his authority.'" Id. (quoting Misco, 484 U.S. at 38).

"In a case in which the arbitrator purports to interpret the language of a collective bargaining agreement," as is the case here, "a party who seeks judicial review ordinarily must demonstrate that the award is contrary to the plain language of the [collective bargaining agreement] and that the arbitrator, heedless of the contract language, preferred instead to write his own prescription for industrial justice." Supervalu, 212 F.3d at 65.  In other words:

> a successful challenge to an arbitral award in such circumstances necessitates a showing that the award is "(1) unfounded in reason and fact; (2) based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling; or (3) mistakenly based on a crucial assumption that is concededly a non-fact."

Id. at 66 (quoting Loc. 1445, United Food and Com. Workers Int'l Union v. Stop & Shop Cos., 776 F.2d 19, 21 (1st Cir. 1985)).

All that said, "there are limits to th[e Court's] deference." E. Seaboard Constr. Co. v. Gray Constr., Inc., 553 F.3d 1, 3 (1st Cir. 2008) (quoting Kashner Davidson Sec. Corp. v. Mscisz, 531 F.3d 68, 70 (1st Cir. 2008)).  As relevant here, a court "may vacate an arbitration award if it 'violate[s] an "explicit . . . well defined and dominant" public policy, as ascertained "by reference to . . . laws and legal precedents."'" Unión Internacional UAW, Loc. 2415 v. Bacardí Corp., 8 F.4th 44, 51 (1st Cir. 2021) (quoting Mercy Hosp., Inc. v. Mass. Nurses Ass'n, 429 F.3d 338, 343 (1st Cir. 2005) (alteration in original) (quoting W.R. Grace & Co. v. Loc. Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 766 (1983))).

## II.     BACKGROUND

### A.     Factual Background

#### 1.     The Alleged Conduct

Timothy Underwood was employed by Wynn at the Encore Boston Harbor ("Encore"), a

luxury resort and casino, as a server at the On Deck Burger Bar restaurant. [Compl. at 1, ¶¶ 2,

11].

Wynn alleges that

[o]n October 2, 2022 [(the "October 2 Incident")], a female coworker working in
the restaurant asked Underwood if he was upset.  Underwood responded, "my name
ain't dick, so keep it out of your mouth."  The female employee asked him whether
he was kidding, and Underwood responded by saying it twice more.  The female
coworker told him that this was disrespectful.

The female coworker reported the incident to Encore management.  She described
the statement as disrespectful and having sexual overtones and that she was upset.

[Compl. ¶¶ 13–14].

Local 26 generally denies these allegations.  See [ECF No. 9 ("Answer" or "Ans.")

¶¶ 13–15].  Nevertheless, "after an investigation, Underwood was terminated on October 11,

2022."  [Compl. ¶ 15].

#### 2.     The Collective Bargaining Agreement ("CBA") and Encore Harassment Policy

Local 26 and the International Brotherhood of Teamsters, Local 25 (the "Teamsters") are

the exclusive bargaining representative of certain employees at Encore.  [Compl. ¶ 4; Ans. ¶ 4].

Encore, Local 26 and the Teamsters were parties to a collective bargaining Agreement (the

"CBA") from April 19, 2021 through April 18, 2023.  [Compl. ¶ 5; ECF No. 1-2 (the "CBA")].

The following provisions of the CBA are relevant here:

- **Article 17[,] Discipline and Discharge**[:] Employees may be discharged,
  suspended, or disciplined by the Employer for just cause.  The parties agree

4

that the policy of progressive discipline shall be used in all cases where warranted but egregious matters may result in suspension pending investigation (SPI) or termination with no prior discipline. . . . . [CBA at 15].

- **Article 28[,] Sexual / Harassment and Workplace Violence**[:] Harassment and workplace violence will not be tolerated. Individuals engaging in such conduct will be subject to discipline including immediate discharge. Harassment for the purposes of this article includes, but is not limited to, abusive or threatening language, conduct creating a hostile work environment, workplace violence and sexual harassment. . . . [Id. at 22].

In addition to the CBA, Encore has a Preventing Harassment and Discrimination Policy.

[ECF No. 1-3 (the "Encore Harassment Policy")]. The Encore Harassment Policy states the following:

Harassment and discrimination are unacceptable. We are committed to creating a respectful, courteous work environment free of unlawful discrimination and harassment of any kind. The Company does not tolerate sexual or other unlawful harassment or discrimination by any employee, volunteer, vendor, contractor, consultant, agent, guest, customer, or visitor. Harassment and discrimination are breaches of Company policy, and may be violations of state and/or federal law. In addition to any disciplinary action that the Company may take, up to and including termination, offenders may also be personally liable for any legal and monetary damages.

[Id. at 2]. It further defines "harassment" as

unwelcome conduct, as determined by the recipient of the harassing behavior, whether verbal, physical or visual, that is based upon a person's Protected Characteristic. The Company maintains a strict policy prohibiting unlawful harassment and discrimination, and will not tolerate harassing conduct that affects tangible job benefits, that unreasonably interferes with an individual's work performance, or that creates an intimidating, hostile or offensive working environment. We are committed to taking all reasonable steps to prevent such harassment and discrimination. . . .

Sexual harassment may take different forms, including . . . innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions, lewd remarks . . . and verbal abuse or "kidding" that is oriented toward a prohibited form of harassment, including that which is sexual in nature and unwelcome.

[Id.].

### 3.     The Arbitration Award

Local 26 grieved Underwood's termination and "ultimately took the grievance to arbitration before an arbitrator."  [Compl. ¶ 16].  A hearing was conducted in February 2023, [id. ¶ 17; Ans. ¶ 17], and the Arbitrator issued his award on May 2, 2023, [Compl. ¶ 18; ECF No. 1-1 (the "Arbitration Award" or "Arb. Award")].  The following is a summary of the Arbitration Award, which found that Encore had not "demonstrated just cause for [Underwood]'s discharge, [that] the grievance must be sustained[, and that t]he remedy shall include a reduction of the discharge to a written warning, reinstatement and make whole relief[,]" which included backpay. [Arb. Award at 19–20].

### i.     The October 2 Incident

The "issues" before the Arbitrator were (1) "[w]hether there was just cause for the grievant's discharge[,]" and (2) "[i]f not, what shall be the remedy?"  [Arb. Award at 3].

The Arbitration Award starts by finding that prior to the October 2 Incident, Underwood "had no disciplinary record."  [Arb. Award at 4].   In addition, he and the hostess "appeared to have a good workplace relationship" and "to have exchanged off color jokes, although the hostess denied on cross examination the jokes exchanged had any sexual content."  [Id. at 5–6]. As a specific example, when Underwood previously

> asked why [the hostess] ventured so far to find a boyfriend [who lived out of state], she is claimed to have responded: "my name ain't Dick, so keep it out of your mouth." The grievant claims to have understood the phrase to be a way of telling someone to stay out of their affairs and that this belief shaped his conduct on October 2.  The hostess was not asked about this claimed interaction.

[Id. at 6].

Regarding the October 2 Incident:

On the critical day, the grievant was rolling silverware along with another employee when the hostess walked by and observed the grievant's seemingly being in a bad

mood.  She mentioned that to the employee working with the grievant.  According to the grievant the hostess[] spoke to the employee in Spanish and the grievant heard her use what he called a pet name she had for him.  In her written statement, the hostess claims to have told the grievant to lighten up and to have made a "frowny" face to him.

The hostess testified that upon observing the grievant's demeanor and asking him if he was upset, he responded: "my name ain't Dick, keep it out of your mouth." The grievant claims to have thought that he was telling the hostess to keep quiet. The hostess did not understand it [sic] that way.  She testified to responding: "Are you joking?" Her written statement recites her asking whether he was "serious."  She testified that the grievant responded by saying it again.  Upon hearing him utter the phrase a second time, her written statement recites her having told him that [he] was being disrespectful and to "chill out."  In her hearing testimony she claims to have said: "are you serious, we don't joke around like that."  The grievant is claimed to have uttered the phrase a third time.

The grievant's account, albeit not his understanding of the interchange, is, in some respects, more inculpatory than the hostess'.  He testified that after he first uttered the critical phrase, she told him "don't disrespect me" which he somehow construed as continuing their joking relationship.  This belief is claimed to have prompted him to utter the phrase a second time to which she responded again "don't disrespect me."  At that point, he testified to having stopped using the phrase and denied using it a third time.  His acknowledgement of only uttering the phrase twice is consistent with the written statement submitted by the employee with whom he was working.  The grievant acknowledged that after he resumed rolling silverware, the hostess "stormed off," prompting the grievant to realize that she was angry.

[Arb. Award at 6–7].

The hostess provided a written statement describing what happened to Employee Relations, "prompting the Director of Employee Relations to interview [Underwood] on October 5, 2022."  [Arb. Award at 7–8].  "At that interview, [Underwood] admitted making the statement[, and t]he Director is claimed to have thanked [Underwood] for 'making it easy.'"  [Id. at 8].

Thereafter, Underwood wrote to a manager and

apolog[ized] for making the hostess take offense and acknowledged "underestimating" how much of an offense was taken.  After expressing the hope that he would be permitted to return to work, he promised that upon his return he would be "more courteous and professional with all of my teammates."  He also

expressed a desire to apologize to the hostess, but acknowledged understanding that she might not be interested in hearing it from him.

[Arb. Award at 8].

Ultimately, the Director was satisfied that his interview with the grievant aligned with the written statements of the hostess and the other employee. Taken together, he concluded that they demonstrated the grievant's repeated utterance of the critical phrase. Despite acknowledging its importance, the Director does not appear to have afforded much, if any consideration to the context in which the grievant claimed the statement was uttered and thus failed to assess the grievant's relationship with the hostess. He viewed the evidence as sufficient to provide just cause for the grievant's termination.

[Arb. Award at 8–9].

ii.     Encore's Sexual Harassment History

The Arbitrator next reviewed prior instances of alleged harassment and their resolution. See [Arb. Award at 9]. He found that "[t]he record contains evidence of thirty-four cases in which Encore disciplined employees violating its harassment policy." [Id.]. Of those cases, "all but six resulted" in termination. [Id.]. After detailing some of those cases, the arbitrator found that "Encore acknowledge[d] that there have been cases where employees charged with uttering unwelcome comments have received only written warnings." [Id. at 10]. As one example, a server was given a written warning after being "charged . . . with making advances to a Coordinator despite learning she had a boyfriend, staring at the Coordinator's body and grabbing her hand." [Id. at 10–11]. The server "admitted the allegations and pledged . . . that he would not repeat the conduct." [Id. at 11].

iii.     The Arbitrator's Decision

In resolving the case before him, the Arbitrator first found that while Article 17[1] of the CBA "provides that employees may be disciplined or discharged for just cause and recites the parties' agreement to utilize progressive discipline 'in all cases where warranted,'" [Arb. Award at 13], Article 28 "addresses sexual harassment cases, . . . and provides simply that employees 'engaging in such conduct will be subject to discipline including immediate termination.'  It makes no reference to just cause, much less progressive discipline," [id. at 13–14].  The Arbitrator nonetheless elected to "apply the traditional just cause standards" because the "case [was] submitted under the just cause standard."  [Id. at 14].

> Under those standards, Encore has the burden of demonstrating that the grievant engaged in conduct warranting discipline and that the demonstrated misconduct warranted his discharge.  Encore has only sustained the burden of demonstrating that the grievant engaged in conduct warranting discipline.

[Id.].

With respect to the conduct, the Arbitrator first concluded that the statements were "verbal conduct . . . of a sexual nature" that were "suffic[ient] to implicate Encore's sexual harassment policy."  [Arb. Award at 14].  Second, the "conduct . . . was unwelcome."  [Id. at 15].  "Once the hostess communicated that [Underwood's] comment was disrespectful and unwelcome, he was obligated to cease uttering the statement.  The hostess communicated that intent and by ignoring her signal the grievant violated applicable Encore policies."  [Id.].  Third, because Underwood "engaged in verbal conduct of a sexual nature and directed it to a person to whom it was unwelcome[,] . . . [Encore] [had] demonstrated just cause for disciplinary action."

---

[1] It appears that the Arbitrator incorrectly referred to Article 19 in this section, [Arb. Award at 13], as the quoted language is from Article 17, [CBA at 15–17].

[Id. at 16].  "The more difficult issue in this case," the Arbitrator then found, was "whether [Underwood]'s demonstrated misconduct was just cause for his summary termination."  [Id.].

With regards to Article 28, the Arbitrator explained that given the industry at issue, "Encore's interest in deterring employees from engaging in conduct violating its harassment policy is significant[,]" and Article 28 "evidences the parties' recognition" of this "special concern."  [Arb. Award at 16–17].  He acknowledged "Article 28's reference to discipline might argue for conferring more discretion on Encore than normal[,]" but "[d]oing so would undermine the [CBA]'s recognition of the role progressive discipline plays in the just cause analysis."  [Id. at 17].  Moreover, the Arbitrator found that the CBA's "reference to just cause also preserves the [Local 26]'s ability [to] demonstrate that a grievant was treated more harshly than would be suggested by an employer's previous discipline for the same offense."  [Id.].

The Arbitrator then found that Local 26 had "made . . . a demonstration . . . compelling a finding that [Encore] failed to demonstrate just cause for [Underwood's] summary termination."  [Arb. Award at 17].  Specifically, he found that although "termination has been the most frequent sanction applied by Encore for instances of sexual harassment[,] . . . [t]he evidence also demonstrates that there have been cases, before and after the effective date of the [CBA], where Encore's disciplinary hand has been more restrained."  [Id.].  "[O]n the spectrum of all of these cases[,]" the conduct here was "less offensive than the language used in cases prompting an employee's termination."  [Id.].  Moreover, the arbitrator determined that similar to the server who was given a written warning after being "charged . . . with making advances to a Coordinator despite learning she had a boyfriend, staring at the Coordinator's body and grabbing her hand[,]" [id. at 10–11], which the Arbitrator found was more severe than Underwood's conduct, [id. at 18], Underwood's "post-incident conduct puts him in at least as good as if not a

better light than the server[,]" [id.], who "admitted the allegations and pledged . . . that he would

not repeat the conduct[,]" [id. at 11].  In particular, the Arbitrator found that

> [Underwood]'s October 5 email to his manager recognized he was in the wrong and
> needed to change.  This message was likely prompted by his interview with the
> Director.  It seems more powerful than the server's promise to Employee Relations,
> which was presumably made under the threat of more serious discipline.  Despite
> these differences, the server received a written warning, while [Underwood] was
> discharged.  The evidence supports finding [that Underwood] was treated more
> harshly than the server.

[Id. at 18].

In light of the difference in conduct between Underwood and the server and the fact that

Underwood "was treated more harshly," [Arb. Award at 18–19], the Arbitrator concluded that

"Encore ha[d] not sustained the burden of demonstrating just cause for his summary

termination," [id. at 19].  Specifically, Underwood's "expression of contrition to his manager

provides more evidence than does the servers that his demonstrated misconduct is amenable to

progressive discipline.  Since [Underwood] has no disciplinary record, Encore's policy would

provide for his receiving a written warning, the first level of progressive discipline."  [Id.].

### B.    Procedural History

Wynn filed the Complaint on May 31, 2023, [Compl.], and Local 26 answered on August

4, 2023, [Ans.].  On October 2, 2023, Wynn moved for judgment on the pleadings.  [ECF No.

14].  Local 26 opposed and cross-moved for judgment on the pleadings on October 16, 2023.

[ECF No. 17].  Wynn opposed Local 26's cross-motion on October 30, 2023, [ECF No. 19], and

Local 26 replied on November 13, 2023, [ECF No. 20].

**III.**       **DISCUSSION**

    **A.**       **The Arbitration Award**

Wynn generally argues that the Arbitration Award should be vacated because it is contrary to (1) "the terms of the parties' CBA," and (2) "the well-established policy against sexual harassment."  See, e.g., [ECF No. 15 at 8].  Local 26 responds that the Arbitration Award draws its essence from the CBA, [ECF No. 18 at 9], and that even though "[c]ourts have recognized [that] there is a public policy against harassment, this policy does not require termination for every employee who commits harassment," [id. at 12].  Local 26 further avers that the Court should order Wynn to immediately comply with the Arbitration Award and to pay attorneys' fees and expenses due to the "spurious challenge" to the Arbitration Award.  [Id. at 16].

    **1.**       **The Arbitrator's Interpretation of the CBA**

In arguing that the Arbitration Award is "contrary to the express language of the [CBA,]" [ECF No. 15 at 15], Wynn points to Article 28 of the CBA, which addresses sexual harassment in the workplace, [CBA at 22], and asserts that "[n]otwithstanding the plain language" of the CBA and the Arbitrator's finding that Underwood engaged in sexual harassment, the Arbitrator improperly "decided that Encore could not resort to immediate discharge in this case as a means for eliminating sexual harassment from its property," [ECF No. 15 at 16].  Wynn further takes issue with the Arbitrator's comparison of Underwood's conduct to the conduct of prior employees who were not discharged, and states that "[t]his is a quintessential example of an arbitrator attempting to substitute his own brand of industrial justice for clear contract language permitting immediate discharge."  [Id. at 17].

12

Local 26 responds that, among other things, the Arbitrator "squarely addressed the parties' stipulated issue of whether there was just cause for [Underwood's] discharge and, after review of the evidence, determined there was not." [ECF No. 18 at 9]. Moreover, it avers that "even if this Court disagrees with this interpretation of the relationship between Articles 17 and 28, the parties negotiated for, and received, the Arbitrator's interpretation." [Id. at 10]. Further, it states that "[e]ven if this Court were inclined to second-guess the Arbitrator's interpretation of the collective bargaining agreement, Article 28 does not require immediate discharge for every offense." [Id. at 11].

As explained above, the Arbitrator found the following with respect to Articles 17 and 28 of the CBA:

> Article 1[7] of the Agreement provides that employees may be disciplined or discharged for just cause and recites the parties' agreement to utilize progressive discipline "in all cases where warranted." Article 28 addresses sexual harassment cases, among others, and provides simply that employees "engaging in such conduct will be subject to discipline including immediate termination." It makes no reference to just cause, much less progressive discipline. This could suggest that the parties intended a standard other than the pure just cause standard to apply in cases like the present. Alternatively, the term "discipline" could reference the just cause standard in Article 1[7]. Because this case has been submitted under the just cause standard, the arbitrator will apply the traditional just cause standards.

[Arb. Award at 13–14].

Had the Court been deciding this matter in the first instance, it might well have reached different conclusions than did the arbitrator, including regarding the relative severity of the conduct at issue here (which is inexcusable in a workplace). See [Arb. Award at 10–11]. That said, in light of the great deference it must afford to the Arbitrator's decision, see Supervalu, 212 F.3d at 65, the Court finds that the Arbitration Award was not contrary to the CBA because the Arbitrator reasonably "constru[ed] [and] appl[ied] the contract and act[ed] within the scope of his authority." See id. (quoting Misco, 484 U.S. at 38).

First, the CBA is ambiguous as to the relationship between Articles 17 and 28, and whether sexual harassment is per se just cause for termination under Article 17, Article 28 notwithstanding.  See [CBA at 15–16, 22–23].  The fact that sexual harassment is not specifically listed as just cause under Article 17 makes this case different from Poland Spring Corp. v. United Food & Com. Workers Int'l Union, 314 F.3d 29 (1st Cir. 2002) and Georgia-Pacific Corp. v. Loc. 27, United Paperworkers Int'l Union, 864 F.2d 940 (1st Cir. 1988), which Wynn cites in support of its position that the Arbitrator misinterpreted the CBA.  [ECF No. 19 at 7]; see Poland Spring, 314 F.3d at 31 (vacating arbitration award downgrading a termination to a suspension where employee was insubordinate and the CBA provided that "[d]iscipline and discharge shall only occur for just cause.  The parties agree that just cause for discharge shall include, but not be limited to, the following: . . . Insubordination."); id. at 34 ("[O]nce an arbitrator finds that an employee has committed an act specifically listed in the collective bargaining agreement as providing just cause for termination, the arbitrator is not free to fashion a separate remedy apart from the one provided by the parties' agreement.") (internal citation omitted); id. at 35 ("By enumerating offenses that are subject to immediate discharge and distinguishing those offenses from other forms of misconduct that warrant a warning prior to discharge, the parties manifested their intent to remove from the arbitrator's discretion the power to fashion his own remedy for those offenses expressly subjected to automatic discharge."); Georgia-Pacific, 864 F.2d at 941–43 (reversing district court decision to uphold arbitration award reinstating an employee with backpay where employee lied about his ability to work, as the CBA provided that "[a]ny employee may be discharged for just cause.  Without limiting the generality of the foregoing some of the causes for immediate discharge are: . . . (5) dishonesty[.]").  Given the ambiguity in the present case, it fell to the arbitrator to decide whether Article 28 was the exclusive provision

with respect to discipline for sexual harassment, or whether discipline for sexual harassment should also be assessed using the just cause standard of Article 17.  Compare [CBA at 15 (Article 17 stating that "Employees may be <u>discharged</u>, suspended, <u>or disciplined</u> by the Employer for just cause.") (emphasis added)], <u>with</u> [<u>id.</u> at 22 (Article 28 stating that "[i]ndividuals engaging in such conduct will be subject to <u>discipline</u> including immediate <u>discharge</u>.") (emphasis added)].[2]

Second, in part given the ambiguity in the CBA, the Arbitrator was within his discretion to interpret the dispute as having "been submitted under the just cause standard," which gives Encore the burden of demonstrating that Underwood "engaged in conduct warranting discipline" up to and including "his discharge."  [Arb. Award at 13–14].[3]

As a result, the Court will not vacate the Arbitration Award as it "dr[ew] its essence from the" CBA, applied the specific facts of the case, and was supported by reasoning that was not "so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling . . . ."  See <u>Supervalu</u>, 212 F.3d at 65–66.

---

[2] This is particularly the case where Article 28 is permissive as to whether discharge is required. [<u>Id.</u> at 22 ("Individuals engaging in such conduct will be subject to discipline <u>including</u> immediate discharge.") (emphasis added)].  Article 17 is similarly permissive: "The parties agree that the policy of progressive discipline shall be used in all cases where warranted but egregious matters may result in suspension pending investigation (SPI) or termination with no prior discipline."  [CBA at 15].

[3] Wynn argues that the "Union . . . misstates the stipulated issue before the [A]rbitrator," [ECF No. 19 at 2], citing to its original brief to the Arbitrator as support, [<u>id.</u> (citing ECF No. 18-3)]. But its brief to the Arbitrator undermines this argument in several ways.  First, its very first sentence is "Encore Boston Harbor ("Encore") had just cause to terminate grievant Tim Underwood ("Underwood")."  [ECF No. 18-3 at 1].  Second, it states that the "Issue" is "Did Encore have just cause to terminate the Grievant? If not, what shall be the remedy?"  [<u>Id.</u> at 10].  Third, its argument in support of upholding Underwood's firing was that "Encore had just Cause to Terminate the Grievant."  [<u>Id.</u> at 10–12].

2.      **Public Policy**

A court "may vacate an arbitration award if it 'violate[s] an "explicit . . . well defined and dominant" public policy, as ascertained "by reference to . . . laws and legal precedents."'" Bacardí, 8 F.4th at 51 (1st Cir. 2021) (quoting Mercy Hosp., 429 F.3d at 343 (alteration in original) (quoting W.R. Grace & Co., 461 U.S. at 766)).

Wynn argues that that Arbitration Award violates public policy by "condon[ing] sexual harassment in the workplace[,] . . . inhibit[ing] Encore from taking reasonable steps to prevent sexual harassment in the workplace[,]" and forcing "Encore to reinstate an employee who has committed sexual harassment." [ECF No. 15 at 12–13].

Local 26 responds that although "[c]ourts have recognized there is a public policy against harassment, this policy does not require automatic termination for every employee who commits harassment." [ECF No. 18 at 12]. Moreover, Wynn "remains able to prevent sexual harassment in the workplace." [Id. at 13].

In support of their arguments, the parties point to several out of circuit cases, as the First Circuit does not appear to have ruled on this issue: Wynn to Stroehmann Bakeries, Inc. v. Loc. 776, Int'l Bhd. of Teamsters, 969 F.2d 1436 (3d Cir. 1992) and Newsday, Inc. v. Long Island Typographical Union, 915 F.2d 840 (2d Cir. 1990), [ECF No. 15 at 13 & n.4]; and Local 26 to Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO ex rel. Local Union 676, 171 F.3d 971 (4th Cir. 1999), Chrysler Motors Corp. v. Int'l Union, Allied Indust. Workers, 959 F.2d 685 (7th Cir. 1992), Commc'n Workers of Am. v. Se. Elec. Coop., 882 F.2d 467 (10th Cir. 1989), and Way Bakery v. Truck Drivers Loc. No. 164, 363 F.3d 590 (6th Cir. 2004), [ECF No. 18 at 12]. Despite the appeal of Wynn's position, having reviewed these cases, the Court cannot

find that the Arbitrator's decision violates a public policy against sexual harassment to such an extent that the Arbitration Award must be overturned.

First, this case is different from Newsday, where the accused harasser had repeatedly engaged in physical sexual harassment and had been warned that future similar conduct would be grounds for immediate discharge.  915 F.2d at 842–43, 845.  There, the Second Circuit affirmed the district court's decision to vacate an arbitration award reinstating an employee accused of sexual harassment.  Id. at 841.  The arbitrator had found that the accused harasser had engaged in a number of inappropriate acts of sexual harassment over a period of years and had been warned to stop the conduct.  See id. at 842–43.  Nonetheless, the arbitrator found that these incidents did not create just cause for termination, and instead called for progressive discipline.  Id. at 843.  In affirming vacatur, the Second Circuit held that the "award of reinstatement completely disregarded the public policy against sexual harassment in the work place[,]" and ignored a prior arbitrator's warning that "any further acts of harassment by [the accused] would be grounds for discharge."  Id. at 845.  It further reasoned that the "award condone[d] [the] latest misconduct; it tend[ed] to perpetuate a hostile, intimidating and offensive work environment[,] [the accused] ha[d] ignored repeated warnings[,] [and a]bove all, the award prevent[ed] Newsday from carrying out its legal duty to eliminate sexual harassment in the work place."  Id.

In Stroehmann Bakeries, the Third Circuit similarly held that "an arbitrator's award reinstating an employee accused of sexual harassment without a determination regarding the merits of the allegation violated well-established and dominant public policies concerning sexual harassment in the workplace," 969 F.2d at 1438, because it "would allow a person who may have committed sexual harassment to continue in the workplace without a determination of whether sexual harassment occurred," id. at 1442.  There, the Court distinguished Communication

Workers of America, relied upon by Local 26 in support of the Arbitration Award here and discussed below, [ECF No. 18 at 12], on the grounds that the arbitrator in that case "concluded that the discharged employee had committed sexual harassment only one time, but was penitent and apologetic about it, and his record was otherwise unblemished[,]" and the arbitrator "expressly noted that the arbitrator had incorporated the public policy against sexual harassment into his reasoning in reaching his decision." Stroehmann Bakeries, 969 F.2d at 1443 (citing Commc'n Workers of Am., 882 F.2d at 468–69); see also id. (The "[a]rbitrator [] studiously avoided the charges against [the accused] and did none of the things the arbitrator did in Communication Workers[;] [he] did not consider either the evidence or the credibility of the witnesses before him[,] [h]e did not make a finding on the merits of the sexual harassment allegation, and he neither considered nor respected the pertinent public policy").

The arbitrator in Communication Workers of America found that "a one-time offense, albeit it was a sexual offense of a serious nature in a sensitive industry, should not lead to discharge." 882 F.2d at 468. In addition,

> [t]o reach []his conclusion, the arbitrator compared this case to another one in which the employer specifically warned the employee that the commission of a second sexual offense while on the job would result in his termination. Although discharge was then warranted when that employee committed a second offense, the arbitrator believed in [the accused]'s case that some corrective discipline was more appropriate "in an effort to salvage the career of this long-time employee with such a good work record." The arbitrator found that during his nineteen years of employment . . . , [the accused] maintained a good work record, which, despite one disciplinary matter that was ordered expunged from his record, reflected no warnings for any "sex-related offenses." The arbitrator concluded that just cause did not exist for [the] discharge, but that suspension for one month without pay was commensurate with the improper conduct.

Id. Although the Tenth Circuit noted the argument that public policy against sexual harassment called for vacatur, see id. at 469, it nevertheless held that "the arbitrator brought 'his informed judgment to bear in order to reach a fair solution of a problem[, which] is especially true when it

comes to formulating remedies,'" id. at 470 (quoting Enter. Wheel & Car, 363 U.S. at 597); see also Westvaco, 171 F.3d at 972–74, 976–77 (reversing district court's decision to vacate arbitration award overturning a termination and imposing a suspension for sexual harassment in part because "[a]ll of the protections of a labor arbitration process would go for naught if they could be undone by a broad and amorphous public policy exception[,]" and "while it is certainly true that there is a public policy against sexual harassment, . . . [t]here is no public policy that every harasser must be fired."); Chrysler Motors, 959 F.2d at 687–89 (finding that "[t]he public policy against sexual harassment in the work place is well-recognized," but nevertheless holding that "[w]hile [the Seventh Circuit] d[id] not condone [the sexual harassment] behavior, it was within the purview of the collective bargaining agreement and public policy for the arbitrator to order [the accused's] reinstatement").

Similar to the arbitrator in Communication Workers of America, the Arbitrator here noted that "[g]iven the history of the industry in which it participates, Encore's interest in deterring employees from engaging in conduct violating its harassment policy is significant." [Arb. Award at 16. After acknowledging the public policy against sexual harassment, he then crafted what he believed to be an appropriate remedy in light of the language of the CBA, [id. at 13–14], as well as the specific facts before him, including that Underwood had no prior disciplinary record, [id. at 4], he and the hostess had a "good workplace relationship" and "appear[ed] to have exchanged off color jokes," [id. at 5], and he apologized and "promised" that he would be "more courteous and professional" going forward, [id. at 8]. Again, although the Court might have found differently had it considered this issue in the first instance, like the Tenth Circuit in Communication Workers of America, it properly defers to the decision of the Arbitrator. See 882 F.2d at 470. Accordingly, the Court affirms the Arbitration Award.

B.      **Interest, Attorneys' Fees and Costs**

In its cross-motion, Local 26 requests interest on backpay, attorneys' fees and costs in light of Wynn's "spurious" challenge to the Arbitration Award.  [ECF No. 18 at 16].  In response, Wynn avers that Local 26's "request for interest and attorneys' fees is without merit and demonstrates only [Local 26]'s failure to comprehend or respect Encore's obligation to prevent sexual harassment on its property under the law and in accordance with the parties' Agreement."  [ECF No. 19 at 9].  Moreover, Wynn argues that an award of interest is inappropriate where the Arbitration Award did not provide for it.  [Id.].

"[A]n award of attorney's fees . . . [and] prejudgment interest on an arbitrator's award of back pay is within the equitable power and discretion of the Court."  Burke Dist. Corp. v. Pro. Salesmen's Union, No. 84-cv-03246, 1986 WL 10332, at *2 (D. Mass. Sept. 10, 1986).

With respect to interest, the Court declines to award interest, particularly in light of the Arbitrator's decision not to do so.  See [Arb. Award at 20]; Burke, 1986 WL 10332, at *2 (declining to award interest in part because, "[w]hile prejudgment interest may constitute an appropriate element of recovery, . . . the Labor Management Relations Act does not specifically authorize such a payment," and "in awarding the grievant back pay in his decision, the arbitrator in the instant case did not see fit to include any provision for interest.").

Regarding attorneys' fees, "[u]nder the so-called 'American Rule,' absent an authorizing statute or contractual commitment, litigants generally bear their own costs."  Loc. 285, Serv. Emps. Int'l Union v. Nonotuck Res. Assocs., Inc., 64 F.3d 735, 737 (1st Cir. 1995) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975)).  "One of the exceptions to this rule, however, is that a court may award the prevailing party its attorney's fees if it determines that the losing party has 'acted in bad faith, vexatiously, or for oppressive

reasons." Id. (quoting <u>Alyeska Pipeline</u>, 421 U.S. at 258–59).  "[T]he term 'vexatious' means that the losing party's actions were 'frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"  Id. (quoting <u>Wash. Hosp. Ctr. v. Serv. Emps. Int'l Union</u>, 746 F.2d 1503, 1510 (D.C. Cir. 1984) (quoting <u>Christiansburg Garment Co. v. EEOC</u>, 434 U.S. 412, 421, (1978))).  Here, Wynn pursued its legitimate and well-founded interest in discouraging and punishing sexual harassment in its workplaces, and its arguments detailed above, while not meritorious, were definitely not frivolous.  Under these circumstances, the Court declines to award attorneys' fees.

Finally, as to costs, "unless a federal statute, the [Federal] rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d)(1).  Therefore, as the prevailing party, Local 26 is entitled to costs.

## IV.    CONCLUSION

Accordingly, Wynn's motion for judgment on the pleadings, [ECF No. 14], is <u>DENIED</u>. Local 26's cross-motion for judgment on the pleadings, [ECF No. 17], is <u>GRANTED</u> insofar as the Arbitration Award is affirmed, the Complaint is dismissed, and Local 26 is entitled to costs, and <u>DENIED</u> as to the request for interest and attorneys' fees.

**SO ORDERED.**

June 12, 2024                                      */s/ Allison D. Burroughs*
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE